474 S.E.2d 599

HARTLEY MARINE CORPORATION, A
Delaware Corporation, Petitioner
Below, Appellant,

v.

Alan L. MIERKE, State Tax Commis-
sioner of West Virginia, Respon-
dent Below, Appellee.

HARTLEY MARINE CORPORATION, A
Delaware Corporation, Petitioner
Below, Appellant,

v.

Alan L. MIERKE, State Tax Commis-
sioner of West Virginia, Respon-
dent Below, Appellee.

The OHIO RIVER COMPANY, A West
Virginia Corporation, Petitioner
Below, Appellant,

v.

James H. PAIGE III, State Tax
Commissioner of West Virginia
Respondent Below, Appellee.

CROUNSE CORPORATION, A Kentucky
Corporation, Petitioner Below,
Appellant,

v.

James H. PAIGE III, State Tax Com-
missioner of West Virginia, Re-
spondent Below, Appellee.

Nos. 23052, 23053.

Supreme Court of Appeals of
West Virginia.

Submitted Jan. 16, 1996.

Decided July 12, 1996.

G. Thomas Battle, Spilman, Thomas & Battle, Charleston, Paul H. Frankel, Morrison & Foerster, New York City, for Appellants.

Barry L. Koerber, Assistant Attorney General, Charleston, for Appellee.

WORKMAN, Justice.

Hartley Marine Corp. ("Hartley Marine"), The Ohio River Company ("ORCO"), and Crounse Corporation ("Crounse") appeal[1] from orders entered by the Circuit Court of Kanawha County on January 30, 1995, and

---

1. These cases were before the circuit court as separate appeals from administrative decisions issued by the State Tax Commissioner. Since all three cases involve common questions of law and fact, the circuit court granted a joint motion for consolidation.

February 8, 1995, affirming the administrative decisions of the State Tax Commissioner which denied Appellants' petitions seeking refunds of West Virginia fuel use tax payments and affirmed an assessment of additional fuel use tax against Hartley Marine. Appellants contend that imposition of the fuel use tax against them violates the Supremacy, Commerce, Due Process, Equal Protection, and Duty of Tonnage Clauses of the United States Constitution, and is further prohibited by the Northwest Ordinance of 1787 and the Virginia Compact of 1789. Upon review of these claims, we find no impediment, constitutional or otherwise, to the imposition of the fuel use tax against Appellants. Accordingly, we affirm the decision of the lower court.

West Virginia Code § 11–15A–13(a)(2) (1995) imposes an excise tax[2] on the "use or consumption in this state of gasoline or special fuel purchased outside this state at the rate of five percent of the average wholesale price of such gasoline or special fuel...." A minimum wholesale price for purposes of computing the tax is fixed by statute at ninety-seven cents per gallon. W. Va.Code

§ 11–15A–13(a)(1). Every motor carrier operating in West Virginia is required to pay the excise tax on all gasoline or special fuel used within the state. W. Va.Code § 11–15A–13(d).

Appellants are motor carriers as defined by West Virginia Code § 11–15–18(c)(6) (1995)[3] who are engaged in the business of transporting products by watercraft in interstate commerce on the Ohio and Mississippi River systems. Appellants' watercraft[4] operate within this state while traveling on the Ohio River.[5] The sole means of propulsion for Appellants' watercraft is either gasoline or special fuel.[6] Appellants pay a federal use tax on the same fuel subject to the fuel use tax imposed by the State of West Virginia.[7] See 26 U.S.C. § 4042 (1994). Appellants do not pay a state use tax based on fuel consumed in their towboats in any state other than West Virginia.

Appellants filed West Virginia fuel use tax returns with respect to all fuel consumed during the period for which they seek their respective refunds.[8] Along with each of the

---

2. This tax became effective April 1, 1983. Beginning in 1986, the state allowed a credit against the fuel use tax for any "sales tax or compensating use tax" paid on fuel purchased outside the state. W. Va. Code § 11–15A–10a (1995). Appellants have never utilized this credit, however, since they have not paid any sales taxes to other states for fuel consumed in West Virginia.

3. A motor carrier is defined as:

(A) Any passenger vehicle which has seats for more than nine passengers in addition to the driver, any road tractor, tractor truck or any truck having more than two axles, which is operated or caused to be operated, by any person on any highway in this state using gasoline or special fuel; (B) any aircraft, barge or other watercraft, or locomotive transporting passengers or freight in or through this state. W. Va. Code § 11–15–18(c)(6).

4. The watercraft at issue are line-haul towboats.

5. When traveling between river mile markers 40 and 317 while in waters lying east of the low water mark on the west bank of the Ohio River as it existed in 1787, Appellants are operating their respective watercraft in West Virginia. Conversely, they are operating in Ohio when their watercraft travel between mile markers 40 and 317 in waters lying west of the low water mark of 1787.

Because Appellants cannot determine precisely when their watercraft are within this state due to

improvements and changes along the Ohio River which have occurred since 1787, Appellants and the Department of Tax and Revenue had previously agreed to a 15% deduction or allowance in the amount of special fuel use tax owed to compensate for this uncertainty. Appellants relied on this allowance when filing their West Virginia gasoline and special fuel use tax returns.

6. "Special fuel" is defined as:

any gas or liquid, other than gasoline, used or suitable for use as fuel in an internal combustion engine. The term "special fuel" shall include products commonly known as natural or casinghead gasoline and shall include gasoline and special fuel for heating any private residential dwelling, building or other premises....
W. Va. Code § 11–15–18(c)(9).

7. West Virginia does not permit Appellants to take a credit for the federal fuel use tax paid to the Internal Revenue Service for fuel consumed within this state.

8. Through Civil Action No. 90–AA–171, Hartley Marine sought a refund for fuel use tax assessed in the amount of $8,608.94 covering the period of January 1, 1985, through December 31, 1987. In a separate civil action, No. 92–AA–64, Hartley Marine sought a refund in the total amount of $123,989.64 for the period April 1, 1983, through April 30, 1986, and July 1, 1986, through March

returns, Appellants filed separate letters of protest indicating objections to the fuel use tax.

During the periods for which Appellants seek refunds, they engaged in one point, two point, and pass-through business in West Virginia. One point traffic occurs when the origin of a transport is in one state and the destination in another. Thus, one point traffic occurs whenever either the origin or the destination of transport is in West Virginia. Two-point traffic occurs where both the origin and destination of the transport are both in West Virginia. Pass-through traffic, as the name implies, involves neither an origination or destination within this state.

## PREEMPTION

■ We turn first to the circuit court's determination that West Virginia Code § 11–15A–13 is not preempted by federal law. As this is a conclusion of law, our review is de novo. *See* Syl. Pt. 1, *Appalachian Power Co. v. State Tax Department*, 195 W.Va. 573, 466 S.E.2d 424 (1995) (holding that statute interpretation presents legal question subject to de novo review); *Kollar v. United Transp. Union*, 83 F.3d 124, 125 (5th Cir.1996) (recognizing that "preemption is a question of law reviewed *de novo* ").

■ The preemption doctrine has its origin in the Supremacy Clause of the United States Constitution, which states:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2. As interpreted by Chief Justice Marshall, state laws are invalid under the Supremacy Clause if they "interfere with, or are contrary to the laws of congress, made in pursuance of the constitu-

tion." *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 604, 111 S.Ct. 2476, 2481, 115 L.Ed.2d 532 (1991) (quoting *Gibbons v. Ogden*, 9 Wheat. 1, 211, 6 L.Ed. 23 (1824)). Despite the existence of this doctrine, however, preemption is disfavored in the absence of convincing evidence warranting its application: "As we have frequently indicated, '[p]re-emption of state law by federal statute or regulation is not favored "in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." ' " *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 634, 101 S.Ct. 2946, 2962, 69 L.Ed.2d 884 (1981) (quoting *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981), quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963)).

■ Initially, we recognize "the presumption that Congress does not intend to preempt areas of traditional state regulation." *FMC Corp. v. Holliday*, 498 U.S. 52, 62, 111 S.Ct. 403, 410, 112 L.Ed.2d 356 (1990). As explained in *WLR Foods, Inc. v. Tyson Foods, Inc.*, 65 F.3d 1172 (4th Cir. 1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 921, 133 L.Ed.2d 850 (1996), "[t]here is a strong presumption against federal preemption of state law." *Id.* at 1179; *see also CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663–64, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993) (noting that "court[s] interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption" "[i]n the interest of avoiding unintended encroachment on the authority of the States"). This presumption, however, can be rebutted by a clear declaration of legislative intent to preempt state law. *See Hillsborough County, Fla. v. Automated Medical Labs., Inc.*, 471 U.S. 707, 715–16, 105 S.Ct. 2371, 2376, 85 L.Ed.2d 714 (1985) (noting that presumption governs unless preemption " 'was the clear and manifest purpose of Congress' ") (quoting *Rice v. Santa*

---

30, 1990. ORCO sought a refund of fuel use tax paid in the amount of $1,062,402.88 for the periods of April 1, 1983, through April 30, 1986, and July 1, 1986, through March 30, 1990.

Crounse sought a refund in the aggregate amount of $325,662.43 for fuel tax paid during April 1, 1983, and December 31, 1991.

*Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)).

In any preemption analysis, the focus of the inquiry is on congressional intent. *See Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992) (stating that " ' "[t]he purpose of Congress is the ultimate touchstone" ' of preemption analysis") (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443 (1978), quoting *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103, 84 S.Ct. 219, 223, 11 L.Ed.2d 179 (1963)); *accord Morales v. Trans World Airlines*, 504 U.S. 374, 383, 112 S.Ct. 2031, 2036–37, 119 L.Ed.2d 157 (1992). Preemption "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Morales*, 504 U.S. at 383, 112 S.Ct. at 2036 (quoting *FMC Corp.*, 498 U.S. at 56–57, 111 S.Ct. at 407) (internal quotation marks omitted). Thus,

> [i]n the absence of explicit statutory language signaling an intent to pre-empt, we infer such intent where Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the states to supplement federal law, or where the state law at issue conflicts with federal law, either because it is impossible to comply with both or because the state law stands as an obstacle to the accomplishment and execution of congressional objectives[.]

*Northwest Cent. Pipeline Corp. v. Kansas Corp. Comm'n*, 489 U.S. 493, 509, 109 S.Ct. 1262, 1273, 103 L.Ed.2d 509 (1989) (citations omitted).

Although "there can be no one crystal clear distinctly marked formula" for determining whether a state statute is preempted, *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941), the United States Supreme Court has identified two ways in which preemption may be accomplished: expressly or impliedly. *Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88, 98, 112 S.Ct. 2374, 2383, 120 L.Ed.2d 73 (1992); *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309–10, 51 L.Ed.2d 604 (1977). To establish

a case of express preemption requires proof that Congress, through specific language, preempted the specific field covered by state law. *See Interstate Towing Ass'n, Inc. v. City of Cincinnati, Ohio*, 6 F.3d 1154, 1157 n. 3 (6th Cir.1993). Since the parties concede the absence of any express congressional language indicating that state law is to be preempted by federal law, we consider only the theory of implied preemption in this appeal. To prevail on a claim of implied preemption, "evidence of a congressional intent to pre-empt the specific field covered by state law" must be pinpointed. *See Wardair Canada, Inc. v. Florida Dep't of Revenue*, 477 U.S. 1, 6, 106 S.Ct. 2369, 2372, 91 L.Ed.2d 1 and syl. pt. 1, in part (1986).

In deciding whether Congress intended for the federal government to have exclusive control of the inland navigable waterways system, we examine the two recognized types of implied preemption: field preemption and conflict preemption. The United States Supreme Court differentiated these prototypes in *Gade*:

> [F]ield pre-emption[ ] [occurs] where the scheme of federal regulation is " 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' " and conflict pre-emption[ ] [occurs] where "compliance with both federal and state regulations is a physical impossibility," or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[.]"

505 U.S. at 98, 112 S.Ct. at 2383 (citations omitted). Without articulating their arguments as such, Appellants rely on the concept of field preemption whereas Appellee utilizes conflict preemption principles to argue his case.

To support their position of field preemption, Appellants emphasize that the United States Government is responsible for the regulation, servicing, and maintenance of the inland navigable waterways system of which the Ohio River is a part. *See* U.S. Const. art. I, § 8 (setting forth powers of Congress); 33 U.S.C. §§ 1–2805 (1994) (designating regulations concerning operation of navi-

gable waters); 49 U.S.C. §§ 101–80504 (1994) (denoting various regulations pertinent to federal transportation policies and programs). Appellants argue that the federal government's almost exclusive control over the waterways indicates a congressional intent to preempt states from imposing any laws governing the use of waterways. In determining whether such congressional intent exists, the law requires evidence "that Congress has determined to 'occupy the field' . . . and thus to pre-empt all state regulation." *Wardair Canada,* 477 U.S. at 6, 106 S.Ct. at 2372. Appellants contend that Congress has evidenced an intent to "occupy the field" through historical responsibility for the creation, maintenance, improvement, and regulation of the waterways. Additionally, Appellants cite the enactment of The Inland Waterways Revenue Act of 1978 (the "Act"), 26 U.S.C. § 4042, which imposes a federal excise tax on fuel consumption in commercial waterway traffic [9] and 33 U.S.C. § 5 (1994),[10] which prohibits the levying of tolls or operating charges from watercraft passing through any canalized river, as evidence of preemptive intent.[11]

Conversely, Appellee maintains that there is no evidence that Congress wished to preclude states from imposing a fuel use tax in connection with navigation of the inland waterways system. Appellee relies on the fact that, contrary to the exclusive jurisdiction arguments raised by Appellants, West Virginia retains jurisdiction over the Ohio River to the extent its authority has not been preempted by federal law and to the extent that federal law allows states to exercise authority over a river that is part of the inland navigable waterways system. *See,*

*e.g.,* 49 U.S.C. § 10541(c) (1994) (granting individual states power to regulate intrastate transportation by water carriers). In addition, Appellee finds persuasive both the absence of express language prohibiting taxation by the states in pertinent federal legislation and the historical exercise of concurrent taxing jurisdiction by the states over items already taxed by the federal government (e.g. income, fuel, tobacco, alcohol, luxury items, and inheritance income).[12]

In support of his position, Appellee cites *Shell Oil Co. v. State Board of Equalization,* 64 Cal.2d 713, 51 Cal.Rptr. 524, 414 P.2d 820 (1966), *appeal dismissed,* 386 U.S. 211, 87 S.Ct. 973, 17 L.Ed.2d 870 (1967), in which the court rejected the taxpayer's claim that the imposition of California's sales and use tax law on sales of bunker fuel oil to vessels engaged in interstate and foreign commerce was preempted by the Import–Export and Commerce Clauses of the United States Constitution. In concluding that evidence of preemption was nonexistent, the court in *Shell Oil* explained,

> "There seems little doubt * * * that under its power over interstate commerce, Congress can fix the bounds of state taxation of that commerce." Although there has been little direct discussion of the limits of federal preclusion with respect to the area of *taxation,* the rules are fairly clear in the area of *regulation* of commerce. When there is a direct conflict between state and federal statutes, or if the subject demands uniformity of regulation, the state statute must fall; the question of

---

9. Pursuant to 26 U.S.C. § 9506, the amounts collected under 26 U.S.C. § 4042 are transferred to the Inland Waterways Trust Fund for construction and rehabilitation of intracoastal and inland waterways.

10. The pertinent text of 33 U.S.C. § 5 reads:

> No tolls or operating charges whatever shall be levied upon or collected from any vessel, dredge, or other water craft for passing through any lock, canal, canalized river, or other work for the use and benefit of navigation, now belonging to the United States or that may be hereafter acquired or constructed. . . .

11. Because we reject Appellants' attempt to analogize the use tax to a toll which is prohibited pursuant to 33 U.S.C. § 5, we do not discuss this statute at length within the preemption section of this opinion. *See infra* Duty of Tonnage section of this opinion.

12. Appellants respond to this argument by stating that, unlike navigation of the inland waterways, such commodities are not similarly subject to arguably exclusive control by the federal government. Because our ruling on the issue of preemption is not dependent upon the historical aspect of multiple taxation, we find it unnecessary to address this contention.

implied prohibition, however, is another matter.

An issue of implied prohibition arises when a federal act impinges on subject matter which a state statute attempts also to regulate, even though there is no direct contradiction between the enactments. "There is no constitutional rule which compels Congress to occupy the whole field. Congress may circumscribe its regulation and occupy only a limited field. When it does so, state regulation outside that limited field * * * is not forbidden or displaced...." (*Kelly v. State of Washington,* 302 U.S. 1, 10, 58 S.Ct. 87, 92 [82 L.Ed. 3 (1937)].) The intent to occupy the field is " ' * * * not to be implied unless the act of Congress, fairly interpreted, is in actual conflict with the law of the state.' " (*Huron Portland Cement Co. v. City of Detroit,* (1960) 362 U.S. 440, 443, 80 S.Ct. 813, 816, 4 L.Ed.2d 852.) There is no reason to believe that the rule as to the implied occupation of the field of taxation is any more strict; it would indeed be difficult to contend that if Congress has taxed a particular item it thereby precludes a state levy against the same item. 51 Cal.Rptr. at 532–33, 414 P.2d at 828–29 (some citations omitted).

■ The task presented for a court when federal preemption is raised "is to determine whether state regulation is consistent with the structure and purpose of the statute [federal regulation] as a whole." *Gade,* 505 U.S. at 98, 112 S.Ct. at 2383; *accord Hines,* 312 U.S. at 67, 61 S.Ct. at 404. As the Supreme Court in *Wardair Canada* elucidated, "state law is not preempted whenever there is any federal regulation of an activity or industry or area of law." 477 U.S. at 6, 106 S.Ct. at 2372. Because we find nothing in the imposition of a fuel use tax that contravenes the federal statutes at issue or "impairs the objectives of national policy," we determine that the mere imposition of a federal excise tax pursuant to the Act provides insufficient indicia of a congressional intent to prohibit states from imposing a use tax on fuel consumed by watercraft operating on the inland waterways system. *San Diego Unified Port Dist. v. Gianturco,* 651 F.2d 1306, 1311 (9th Cir.1981), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1631, 71 L.Ed.2d 866 (1982).

Much of Appellee's argument focuses on the lack of conflict created as a result of concurrent taxing by the federal government and this state. A conflict occurs " 'to the extent it ... is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.' " *California v. Federal Energy Regulatory Comm'n,* 495 U.S. 490, 506, 110 S.Ct. 2024, 2033, 109 L.Ed.2d 474 (1990) (quoting *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984)) (finding conflict where California regulatory body imposed stricter requirements than Federal Energy Regulatory Commission governing minimum stream flow of hydroelectric project); *see also Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971) (holding that section of Arizona Safety Responsibility Act requiring drivers unable to pay accident expenses to forfeit licenses conflicted with federal bankruptcy code), *superseded by statute as stated in In re Saunders,* 105 B.R. 781 (Bankr. E.D.Pa.1989); *Hawaii Newspaper Agency Ltd. Partnership v. Bronster,* No. 95–00635, 1996 WL 67305 at 4 (D.Hawai'i 1996) (finding conflict based on state statute acting as "obstacle" to objectives of federal Newspaper Preservation Act). Since we determine that Appellants have failed to demonstrate the existence of such a conflict, we are without authority to imply that Congress intended to "occupy the field" of inland waterways. *See Huron Portland Cement Co.,* 362 U.S. at 443, 80 S.Ct. at 815–16 (holding that absent a conflict, no intent to "occupy the field" was to be implied). Upon analysis, Appellants' case is simply not prototypical of those where intent to preempt must be inferred because "state regulations could not be enforced 'without impairing the federal superintendence of the field....' or when 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' " *Gianturco,* 651 F.2d at 1310 (citation omitted); *cf. White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 151, 100 S.Ct. 2578, 2587–88, 65 L.Ed.2d 665 (1980)(holding that Arizona tax on fuel used on tribal roads built, maintained, regulated, and policed by federal government

was preempted by comprehensive federal regulatory scheme covering harvesting and sale of tribal timber).

## COMMERCE CLAUSE

The Commerce Clause is primarily an affirmative grant of power to Congress. "Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States...." U.S. Const. art. I, § 8, cl. 3. The power to regulate interstate commerce is extraordinarily far reaching and authorizes Congress to preempt a broad spectrum of state laws and regulations. If Congress has not exercised its commerce powers in a given area, state law survives until Congress chooses to step in. Thus, most state laws regulating commerce are written upon a sort of legal palimpsest: state laws remain on the books until Congress chooses to overwrite them. On the other hand, there is a negative impact to the Commerce Clause. Although the Constitution is silent on the subject of protecting interstate commerce where Congress has not acted, the United States Supreme Court has long recognized that "the Commerce Clause is more than an affirmative grant of power; it has a negative sweep as well." *Quill Corp. v. North Dakota*, 504 U.S. 298, 309, 112 S.Ct. 1904, 1911, 119 L.Ed.2d 91 (1992) (citing *Gibbons v. Ogden*, 9 Wheat. 1, 231–32, 239, 6 L.Ed. 23 (1824)) (Johnson, J., concurring). The negative Commerce Clause "limits the power of the States to erect barriers against interstate trade." *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 35, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980). Thus, we must not only consider whether existing federal statutes explicitly grant or reject the authority of the state to act in a particular area, we must also review those decisions discussing the limits of permissible state legislation in terms of whether such legislation burdens or interferes with the free flow of interstate commerce. In doing so, we review the circuit court's judgment de novo because it involves the interpretation of statutes which are questions of law.

Unquestionably, even in the absence of explicit congressional authorization, states may enact laws affecting interstate commerce when such statutes do not discriminate against out-of-state interests and when the legitimate state interests outweigh any burdens on interstate commerce. We have no difficulty in concluding that the West Virginia tax does not directly discriminate against interstate commerce, and further, that its effect is not to favor in-state economic interests over out-of-state interests. In determining Commerce Clause challenges under these circumstances, we are instructed by the Supreme Court to evaluate the validity of state law pursuant to the four-pronged standard established in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). Under the *Complete Auto* test, state taxes are upheld as nonviolative of the federal Commerce Clause provided that "the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Id.* at 279, 97 S.Ct. at 1079; *accord Maryland v. Louisiana*, 451 U.S. 725, 754, 101 S.Ct. 2114, 2133, 68 L.Ed.2d 576. We adopted this same test for determining violations of our state commerce clause in syllabus point one of *Western Maryland Railway Co. v. Goodwin*, 167 W.Va. 804, 282 S.E.2d 240 (1981), *appeal dismissed*, 456 U.S. 952, 102 S.Ct. 2025, 72 L.Ed.2d 477 (1982). Appellants argue that the use tax at issue violates the first and fourth prongs of the *Complete Auto* test—the substantial nexus and fairly related tests. *See* 430 U.S. at 279, 97 S.Ct. at 1079.

That this area of law is nebulous at best is beyond dispute. In *Quill Corp.*, the United States Supreme Court acknowledged that "our law in this area is something of a 'quagmire' and the 'application of constitutional principles to specific state statutes leaves much room for controversy and confusion and little in the way of precise guides to the States in the exercise of their indispensable power of taxation.'" 504 U.S. at 315–16, 112 S.Ct. at 1915 (quoting *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 457, 79 S.Ct. 357, 362, 3 L.Ed.2d 421 (1959)). What is clear, however, is that with the issuance of *Complete Auto*, "the court

... rejected the line of cases holding that the direct taxation of interstate commerce was impermissible and adopted instead a 'consistent and rational method of inquiry [that focused on] the practical effect of [the] challenged tax.'" *Quill Corp.*, 504 U.S. at 303–04, 112 S.Ct. at 1908 (quoting *Mobil Oil Corp. v. Commissioner of Taxes of Vt.*, 445 U.S. 425, 443, 100 S.Ct. 1223, 1234, 63 L.Ed.2d 510 (1980)) (alteration in original). The purpose for which the "practical effect" of a challenged tax is examined is "to determine whether it 'is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State.'" *Mobil Oil*, 445 U.S. at 443, 100 S.Ct. at 1234 (quoting *Complete Auto*, 430 U.S. at 279, 97 S.Ct. at 1079).

The Supreme Court made it clear in *Quill Corp.* that the "four-part test [of *Complete Auto*] ... continues to govern the validity of state taxes under the Commerce Clause." 504 U.S. at 310, 112 S.Ct. at 1912. The Supreme Court injected that

> [u]nder our current Commerce Clause jurisprudence, "with certain restrictions, interstate commerce may be required to pay its fair share of state taxes." *D.H. Holmes Co. v. McNamara*, 486 U.S. 24, 31 [108 S.Ct. 1619, 1623, 100 L.Ed.2d 21] (1988); see also *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 623–24 [101 S.Ct. 2946, 2957, 69 L.Ed.2d 884] (1981) ("It was not the purpose of the commerce clause to relieve those engaged in inter-

state commerce from their just share of [the] state tax burden even though it increases the cost of doing business") (internal quotation marks and citation omitted). *Quill Corp.*, 504 U.S. at 310 n. 5, 112 S.Ct. at 1912 n. 5. Accordingly, we concur with Appellee that the standard by which the Commerce Clause challenge must be examined remains the *Complete Auto* test.[13]

■ Appellee argues that the case of *Western Maryland*, is controlling on the issue of whether the first prong of the *Complete Auto* test—the requirement of a substantial nexus between the taxpayer and the taxing state—exists. Union Barge, one of the taxpayers involved in that consolidated case, was a Pennsylvania-based corporation that engaged in transporting freight in barges throughout the United States. 167 W.Va. at 822, 282 S.E.2d at 251. This Court found that Union Barge's one-point and pass-through traffic[14] had sufficient contacts with West Virginia to withstand challenges on the grounds of insufficient nexus for assessing this state's carrier tax. *Id.* at 823, 282 S.E.2d at 252. Those factors that this Court found determinative on the issue included: that the taxpayer's wholly-in state business was done primarily to accommodate its customers or other carriers; that barges were loaded and unloaded in this state at docks owned by companies doing business in this state; that the taxpayer benefitted by charging its customers a demurrage charge for undue delay in loading and unloading the barges; that periodically, the taxpayer's tug-

---

**13.** Appellants assert that the line of fuel tax cases which predate *Complete Auto* should govern this case. *See, e.g., Evansville–Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972); *Ingels v. Morf*, 300 U.S. 290, 57 S.Ct. 439, 81 L.Ed. 653 (1937). Appellee argues that the cases cited by Appellants involve "user" fees or tolls, the assessment of which involves the use of a public facility, whereas the tax at issue in this case is a general revenue tax on the use of tangible personal property purchased in another state. *See Commonwealth Edison*, 453 U.S. at 621, 101 S.Ct. at 2955 (explaining that "user" fees or taxes line of cases "were designed and defended as a specific charge imposed by the State for the use of state-owned or state-provided transportation or other facilities and services"); *Interstate Transit, Inc. v. Lindsey*, 283 U.S. 183, 190, 51 S.Ct. 380, 382, 75 L.Ed. 953 (1931) (explaining

that "although termed a tax, ["user" fees or taxes] cannot be tested by standards which generally determine the validity of taxes"). While Appellee refers to the tax at issue as a general revenue tax, we find it unnecessary to characterize the use tax as a general revenue tax or otherwise. *See Western Maryland*, 167 W.Va. at 826, 282 S.E.2d at 253 n. 3 (noting that form of tax is inconsequential to questions of nexus and state benefits); *but cf. Commonwealth Edison*, 453 U.S. at 622, 101 S.Ct. at 2956 (stating that "States have considerable latitude in imposing general revenue taxes").

**14.** The taxpayer at issue was already paying taxes on its two-point traffic so that type of barge traffic was not in issue. 167 W.Va. at 822, 282 S.E.2d at 251.

boats and crews purchased food and fuel from West Virginia businesses; that drop-off and pick-up points for the taxpayer's employees were in West Virginia; and that repairs on the barges or tugboats were sometimes necessitated in this state. *Id.* at 824, 282 S.E.2d at 252.

In comparison to the indicia examined in *Western Maryland,* Appellee argues that Appellants' business activities present a more compelling case for finding the requisite nexus. Like the taxpayer in *Western Maryland,* Appellants deliver and pick up goods from various West Virginia businesses while consuming fuel as they travel through this state via navigable waters. Appellants also have in common with the Union Barge taxpayer the utilization of West Virginia docks for loading and unloading as well as the occasional need to have repairs performed while in this state. Those factors that enhance Appellants' connection to this state include both the ownership and leasing of real property in West Virginia as well as in-state offices and the employment of state residents.[15] We agree with Appellee that the requisite degree of nexus has been established within the parameters of *Western Maryland. See* 167 W.Va. at 824–26, 282 S.E.2d at 252–53.[16]

■ The second part of Appellants' Commerce Clause challenge involves the question of whether the use tax is fairly related to the services provided by this state. Citing the United States Supreme Court's decision in *Wisconsin v. J.C. Penney Co.,* 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267 (1940), Appellants frame the pertinent inquiry as "whether the state has given anything for which it can ask return." *Id.* at 444, 61 S.Ct. at 250. Appellants contend that the fourth prong of *Complete Auto* is not met since they receive no extra benefits from this state in exchange for payment of the use tax in contrast to the same benefits they receive for payment of other state taxes.[17] In addition, they object to the dedication of the use tax funds for this state's highways. *See* W. Va. Code § 11–15A–13(g).

Edification regarding the nature of the "fairly related" inquiry was provided in *Commonwealth Edison:*

The relevant inquiry under the fourth prong of the *Complete Auto Transit* test is not, as appellants suggest, the *amount* of the tax or the *value* of the benefits allegedly bestowed as measured by the costs the State incurs on account of the taxpayer's activities. Rather, the test is closely connected to the first prong of the *Complete Auto Transit* test. Under this threshold test, the interstate business must have a substantial nexus with the State before *any* tax may be levied on it. Beyond that threshold requirement, the fourth prong of the *Complete Auto Transit* test imposes the additional limitation that the *measure* of the tax must be reasonably related to the extent of the contact, since it is the activities or presence of the taxpayer in the State that may properly be made to

---

**15.** For example, ORCO leases and operates a coal loading facility at Kenova, West Virginia, where it unloads railroad cars and loads river barges through a conveyor system. Approximately 35 employees work at the Kenova facility. According to the record, many of ORCO's employees, which include managerial employees, boat crews, and sales employees, are West Virginia residents.

**16.** The "substantial nexus" argument to some extent derives from *Quill,* a tax case in which the Supreme Court applied the four-part test for determining the validity of a state attempt to tax activities of an out-of-state mail-order house. One of these tests required a substantial nexus with the taxing state. Because the tax involved here also has an impact on interstate trade, we believe that *Quill* compelled us to distinguish it. *Quill* involved a tax that directly burdened inter-

state commerce, and virtually every precedent relied upon by the Court in deciding *Quill* was concerned with attempts by the state to tax interstate commerce directly. The difference between *Quill* and this case is that *Quill* concerned a state's attempt to extend its taxing authority beyond its borders and that case has little application to cases involving a state's attempt to collect taxes on interstate trade and commerce. We do not construe the West Virginia law as an attempt by this state "to control conduct beyond the boundaries of the State." *Healy v. Beer Institute,* 491 U.S. 324, 336, 109 S.Ct. 2491, 2499, 105 L.Ed.2d 275 (1989).

**17.** Appellants state that, in addition to the fuel use tax, they pay taxes to this state on carrier income, corporate net income, business franchise, business registration, and ad valorem property.

bear a "just share of state tax burden." *Western Live Stock v. Bureau of Revenue,* 303 U.S. [250],[ ] 254 [58 S.Ct. 546, 548, 82 L.Ed. 823 (1938)].

453 U.S. at 625–26, 101 S.Ct. at 2957–58 (footnotes and citation omitted). Having ruled above that the necessary nexus exists between Appellants and this state, we need only examine whether the measure of the use tax is reasonably related to Appellants' presence in this state. *Id.*

The measure of West Virginia's fuel use tax is five percent of the "average wholesale price" of fuel "used" within this state. W. Va. Code § 11–15A–13. Thus, it is expressly apportioned relative to that amount of fuel consumed within this state. When examining this same issue in *Commonwealth Edison,* the United States Supreme Court concluded,

> Because it [coal severance tax] is measured as a percentage of the value of the coal taken, the Montana tax is in "proper proportion" to appellants' activities within the State and, therefore, to their "consequent enjoyment of the opportunities and protections which the State has afforded" in connection with those activities. When a tax is assessed in proportion to a taxpayer's activities or presence in a State, the taxpayer is shouldering its fair share of supporting the State's provision of "police and fire protection, the benefit of a trained work force, and 'the advantages of a civilized society." *Exxon Corp. v. Wisconsin Dept. of Revenue,* 447 U.S. [207], [ ] 228 [100 S.Ct. 2109, 2123, 65 L.Ed.2d 66 (1980)], quoting *Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. [434], [ ] 445 [99 S.Ct. 1813, 1820, 60 L.Ed.2d 336 (1979)].

453 U.S. at 626–27, 101 S.Ct. at 2958 (some citations omitted).

■ For the same reasons stated in *Commonwealth Edison,* we conclude that the fourth prong of *Complete Auto* is met in this case. We wholesalely reject Appellants' notion that it is entitled to additional benefits for each tax paid to this state. Taxes are not paid to the state on a quid pro quo basis. It is sufficient for the fairly related test that a taxpayer receives the customary services provided by a state in response to the expectations and demands of a civilized society, such as fire and police protection, opportunities to seek emergency hospital care, food and fuel sources, a trained work force, and judicial access. *See Commonwealth Edison,* 453 U.S. at 626–27, 101 S.Ct. at 2958–59; *Western Maryland,* 167 W.Va. at 826–27, 282 S.E.2d at 253–54. As we explained in *Western Maryland,* all of these state provided services and benefits, whether utilized or not, "contribute to the viability of … [Appellants'] operations overall." *Id.* at 827, 282 S.E.2d at 253.

■ Appellants attempt to find constitutional invalidity on the grounds that their payment of the use tax is not used to improve or maintain this state's navigable waterways. Again, Appellants have misconstrued the concerns inherent in the Commerce Clause. *See Quill Corp.,* 504 U.S. at 312, 112 S.Ct. at 1913 (distinguishing Due Process concerns regarding fundamental fairness of governmental activity from Commerce Clause considerations "about the effects of state regulation on the national economy"). There simply is no requirement that the tax imposed result in a direct and attributable benefit to a taxpayer. As noted in *Commonwealth Edison,*

> the linchpin of appellants' contention is the incorrect assumption that the amount of state taxes that may be levied on an activity connected to interstate commerce is limited by the costs incurred by the State on account of that activity.… But as we have previously noted, interstate commerce may be required to contribute to the cost of providing *all* governmental services, including those services from which it arguably receives no direct "benefit." … [Moreover,] it is difficult to see how the court is to go about comparing costs and benefits in order to decide whether the tax burden on an activity connected to interstate commerce is excessive.

453 U.S. at 627 n. 16, 101 S.Ct. at 2958 n. 16 (citation omitted). Despite Appellants' claims of deriving no benefit from the roads of this state, we can conceive of numerous instances when this state's road system is

used for the benefit, direct and indirect, of Appellants.[18] In any event,

> "A state is free to pursue its own fiscal policies, unembarrassed by the Constitution, if by the practical operation of a tax the State has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society," *Wisconsin v. J.C. Penney Co.,* 311 U.S. 435, 444 [61 S.Ct. 246, 250, 85 L.Ed. 267] (1940).

*Western Maryland,* 167 W.Va. at 827, 282 S.E.2d at 254.

The fourth prong of the *Complete Auto Transit* test requires only that the *measure* of the tax be reasonably related to the extent of the taxpayer's contact with the State, "since it is the activities or presence of the taxpayer in the State that may properly be made to bear a 'just share of the state tax burden[.]'" *Commonwealth Edison,* 453 U.S. at 610, 101 S.Ct. at 2950 (quoting *Western Live Stock v. Bureau of Revenue,* 303 U.S. 250, 254, 58 S.Ct. 546, 548, 82 L.Ed. 823 (1938)). Appellants' have failed to "show that the formula [for use tax calculation] places a burden upon interstate commerce in a constitutional sense." *Northwestern States Portland Cement,* 358 U.S. at 463, 79 S.Ct. at 365. Accordingly, we reject Appellants' claims predicated on Commerce Clause violations.[19]

### EQUAL PROTECTION

■ Appellants raise the ancillary claim that equal protection principles are violated by virtue of comparing its pass-through traffic to that of another taxpayer found not to owe the use tax on its pass-through traffic. Appellants claim that there is no rational

basis for distinguishing the holding in Administrative Decision 86–937 RGU. In that case, the state tax commissioner concluded that the taxpayer involved "flunked" the four prong test of *Complete Auto. See* 430 U.S. at 279, 97 S.Ct. at 1079. At the center of any equal protection analysis is the precept that similarly situated persons within the same class are to be treated equally. *See* Syl. Pt. 5, *Tony P. Sellitti Constr. Co. v. Caryl,* 185 W.Va. 584, 408 S.E.2d 336 (1991), *cert. denied,* 502 U.S. 1073, 112 S.Ct. 969, 117 L.Ed.2d 135 (1992). However, as Appellee points out, the State Tax Commissioner has already addressed this specific issue and determined that the Appellants in this case and the taxpayer in the referenced administrative proceeding are "not identically, nor, indeed, even similarly situated[.]" Moreover, as Appellee notes, because the record pertaining to Administrative Decision 86–937 RGU is not included as part of the record in this case, this Court is without a basis for determining whether the Appellants are similarly situated to the taxpayer in that case. Accordingly, we find no merit to Appellants' equal protection claim.

### DUTY OF TONNAGE

■ Appellants argue that the special fuel use tax violates the Duty of Tonnage Clause which provides that: "No state shall, without the Consent of Congress, lay any Duty of Tonnage...." U.S. Const. art. I, § 10, cl. 3. Appellee concurs that a charge or duty for the privilege of "entering, trading in or lying in" a port, harbor or waterway is forbidden by the Duty of Tonnage Clause. *Clyde Mallory Lines v. Alabama ex rel. State Docks Comm'n,* 296 U.S. 261, 266, 56 S.Ct. 194, 196, 80 L.Ed. 215 (1935). Appellee argues, however, that the use tax at issue is

---

**18.** Two obvious examples of state road usage are commodities delivered within this state that are transported further via the road system and employees commuting to a pick-up spot. Simply stated, the provision and maintenance of this state's road system does contribute to the viability of Appellants' business operations.

**19.** We similarly reject Appellants' Due Process claims, but find it unnecessary to separately address those arguments because, as has been noted, "the '*Complete Auto* test, while responsive to Commerce Clause dictates, encompasses as well

... due process requirements[s].'" *Quill Corp.,* 504 U.S. at 313 n. 7, 112 S.Ct. at 1914 n. 7 (commenting further that this "might suggest that every tax that passes contemporary Commerce Clause analysis is also valid under the Due Process Clause") (quoting *Trinova Corp. v. Michigan Dep't of Treasury,* 498 U.S. 358, 373, 111 S.Ct. 818, 828–29, 112 L.Ed.2d 884 (1991)); *see generally Quill Corp.,* 504 U.S. at 312–13, 112 S.Ct. at 1913–14 (discussing difference between Due Process and Commerce Clause concerns).

not a duty or charge on the entry into or right of navigation on West Virginia waters, but merely an excise tax on the use of special fuel. *See id.* at 264–65, 56 S.Ct. at 195–96 (discussing historical basis for prohibition against duties of tonnage).

To support his position, Appellee cites the decision in *American Commercial Barge Line Co. v. Marcum*, 360 S.W.2d 134 (Ky. 1962), in which the court upheld the Kentucky net income tax against Duty of Tonnage charges. In that case, the taxpayer raised the same argument as Appellants that the tax amounted to an impairment of its free right of navigation on the Ohio River. The Kentucky Supreme Court firmly rejected this contention, finding that the tax was not a prohibited duty of tonnage, but merely a tax on profits gained from business activity within the state. *Id.* at 135.

Additional insight on this issue is provided by the decision in *In re Los Angeles Lumber Products Co.,* 45 F.Supp. 77 (S.D.Cal.1942), in which the court upheld a use tax assessed against a barge purchased outside the state and then brought into the state for use upon navigable waters. Rejecting the taxpayer's argument that the use tax constituted a charge for entering, trading, or lying in port in violation of the Duty of Tonnage Clause, the court reasoned:

> The use or "compensating" tax was devised to equalize taxes in order that those who sold articles manufactured within a state to buyers therein would not be placed at a disadvantage in competition with goods manufactured in other states and sold to buyers within the state.
>
> The prohibition in the federal constitution against the imposition of duties of tonnage was a part of the scheme to give Congress control over the interstate and foreign commerce of the nation....
>
> . . . .
>
> ... It is a tax upon something which occurs *after* the ship has entered the port, viz., the use, storage or consumption of the property within the state.

*Id.* at 81–82 (citations omitted and emphasis supplied).

Appellants urge this Court to view the use tax at issue as a charge for navigation of the rivers in violation of the Duty of Tonnage Clause. If this use tax were solely imposed for fuel consumption on the waters of this state, Appellants' arguments would be more convincing. The use tax at issue, however, is not a prohibited toll on the use of this state's navigable waterways, but an excise tax on the use of fuel which is imposed on *all* motor carriers operating within this state, including, buses, trucks, trains, and aircraft. *See* W. Va. Code §§ 11–15A–13(d), 11–15–18(c)(6). Consistent with the objectives of all use taxes, it is implemented for the purpose of equalizing the effect of purchases from out-of-state suppliers for the benefit of in-state sellers. *See In re Los Angeles Lumber Products,* 45 F.Supp. at 81; *Henneford v. Silas Mason Co.,* 300 U.S. 577, 581, 57 S.Ct. 524, 526, 81 L.Ed. 814 (1937). Accordingly, we find no prohibited charge within the purview of the Duty of Tonnage Clause.

## NORTHWEST ORDINANCE AND VIRGINIA COMPACT

■ Finally, Appellants suggest that the use tax violates the Northwest Ordinance of 1787 and the Virginia Compact of 1789, which each contain language declaring that the Mississippi River and its tributaries shall remain respectively "forever free" and "free." Both parties acknowledge that this issue has been considered and rejected by this Court in *American Barge Line Co. v. Koontz,* 136 W.Va. 747, 68 S.E.2d 56 (1951); *overruled on other grounds by Western Maryland,* 167 W.Va. at 823, 282 S.E.2d at 252 (1981). In *Koontz,* this Court squarely denounced the taxpayer's argument that the Northwest Ordinance prohibited West Virginia from imposing its business tax on the gross income of barge companies operating on the Ohio River. 136 W.Va. at 756–58, 68 S.E.2d at 61–62. We concluded in *Koontz,* that upon each state's admission into the union of the United States of America, that state was placed on equal footing with each of the original states and accordingly, each state had " 'the same power to regulate navigable waters within its borders ...; that is to say, until Congress intervenes, the power of the State, locally exerted, is plenary * * *.' " 136 W.Va. at

757, 68 S.E.2d at 62 (quoting *Economy Light & Power Co. v. United States,* 256 U.S. 113, 121, 41 S.Ct. 409, 412, 65 L.Ed. 847 (1921)). The *Koontz* court concluded that the entry into statehood necessarily resulted in the supersedence of these compacts by the United States Constitution. 136 W.Va. at 757–58, 68 S.E.2d at 61–62. We find no basis for disturbing this Court's ruling in *Koontz.* Accordingly, we reject Appellants' final argument.

Having considered each of Appellants' constitutional challenges and finding them in turn to be without merit, we rule that the fuel use tax that is imposed pursuant to West Virginia Code § 11–15A–13, as it relates to fuel consumed on the inland waterways, does not violate the federal constitution or any other law. Accordingly, the decision of the Circuit Court of Kanawha County is hereby affirmed.

Affirmed.