BENTON, J.
TA Operating Corporation (TA) appeals the final summary judgment denying the refund it sought of excise taxes paid under section 206.87(1), Florida Statutes (1993), when it bought diesel fuel. We affirm, rejecting TA’s contention that, because the fuel was delivered to a common carrier for export to Georgia, a Florida tax on the sale violated the Commerce Clause.
The operative facts are not in dispute.[1] A common carrier picked up diesel fuel in Jacksonville, Florida, for delivery to TA “F.O.B. Brunswick, Georgia.” The parties stipulated that title to the fuel passed in Jacksonville. Amerada Hess, the Florida vendor, collected the taxes in dispute and remitted them to the Florida Department of Revenue (DOR). At the time of the sales in question (on and between March 1 and September 30, 1994) TA had no personnel in Florida, operated no Florida location, and made no sales in Florida. Georgia sales taxes were paid on subsequent resales of the fuel in Georgia.
I.
When the Florida sales took place, TA did not have a Florida license as a dealer in special fuels. As a threshold matter, DOR argues that, because TA had no Florida license as a dealer in special fuels when the taxes in dispute were paid, section 206.87(3)(d), Florida Statutes (1993), precludes TA’s applying for a refund on grounds the taxes were imposed in violation of the Commerce Clause.
We agree that TA was not eligible for the exemption described in the second sentence of section 206.87(3)(d), Florida Statutes (1993), because TA did not have a Florida license as a dealer in special fuels at the time of the transactions. But we reject DOR’s reading of the statute as purporting to make such licensure a precondition to rights the Commerce Clause confers.
Special fuel is defined to include diesel fuel. § 206.86(1), Fla. Stat. (1993). Section 206.87, Florida Statutes (1993), provides:
*1272 (1) An excise tax of 4 cents per gallon is hereby imposed upon every gallon of special fuel used or sold in this state for use....
[[Image here]]
(8) The following sales are not subject to the tax herein imposed:
[[Image here]]
(d) Exports of special fuel by a dealer from the state when exempted by any provision of the constitutions of the United States or the State of Florida. The sale for export from the state of special fuel which is not exempted from the taxes imposed by this part by either the constitution of the United States or of the state shall also be exempt, but only if both the seller and the exporter of the special fuel are duly licensed as dealers of special fuel under the terms of this part.
(Emphasis supplied.) Only the second sentence of section 206.87(3)(d) contemplates persons “duly licensed as dealers.”
Properly construed, the statute does not purport to make licensure a prerequisite for invoking rights under the Commerce Clause or any other constitutional provision. The term “dealer” in the first sentence of section 206.87(3)(d) necessarily means any person who deals in special fuels, without regard to whether the person holds a license. The language “duly licensed as dealers” stands in stark contrast to the unadorned word “dealer” appearing in the first sentence of section 206.87(3)(d). But for the clearly broader sense in which “dealer” is used in the immediately preceding sentence, the contrasting language in the second sentence would be redundant and — given the definition of dealer[2] in section 206.86(10) — 'Unnecessary.
II.
TA maintains that it is entitled to a refund of the disputed taxes because their imposition runs afoul of each of four tests laid down in recent[3] “dormant Commerce *1273 Clause” cases decided by the United States Supreme Court.
Absent congressional approval ... a state tax on ... commerce will not survive Commerce Clause scrutiny if the taxpayer demonstrates that the tax (1) applies to an activity lacking a substantial nexus to the taxing State; (2) is not fairly apportioned; (3) discriminates against interstate commerce; or (4) is not fairly related to the services provided by the State. Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326 (1977).
Barclays Bank PLC v. Franchise Tax Bd., 512 U.S. 298, 310-11, 114 S.Ct. 2268, 129 L.Ed.2d 244 (1994). While failure to pass any one of these tests would render the special fuel tax unconstitutional, we find no merit in any of TA’s arguments as to any of the four tests.
A.
As to the first test, TA posits a separate requirement of substantial nexus not only between the taxing state and the taxable activity, but also between the taxing state and the taxpayer. In support of this contention, TA cites Allied-Signal, Inc. v. Director, Division of Taxation, 504 U.S. 768, 777, 112 S.Ct. 2251, 119 L.Ed.2d 533 (1992); Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977); Quill Corporation v. North Dakota, 504 U.S. 298, 306, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992) and National Bellas Hess, Inc. v. Illinois Department of Revenue, 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967), and argues that TA’s connection with Florida is too slight for Florida to tax the sale of diesel fuel TA bought.
In Allied-Signal, the Court decided that a state may tax its share of a nondomieili-ary corporation’s “unitary” income, where the corporation carries on some discrete business enterprise both inside and outside the state, but cannot tax “nonunitary” income earned by a nondomieiliary corporation in an unrelated business enterprise having no connection to the state. The Court explained that the rule that
a State may not tax value earned outside its borders rests on the fundamental requirement of both the Due Process and Commerce Clauses that there be “some definite link, some minimum connection, between a state and the person, *1274 property or transaction it seeks to tax.” Miller Brothers Co. v. Maryland, 347 U.S. 340, 344-345, 74 S.Ct. 535, 539, 98 L.Ed. 744 (1954).
Alliedr-Signal, 504 U.S. at 777, 112 S.Ct. 2251 (emphasis supplied). The question in AlliecNSignal was how much income a corporate taxpayer — with unquestioned ties to the taxing state and concededly liable for state income taxes in some amount — had to pay taxes on. But the present case is very different. For one thing, it is not an income tax case. The tax at issue here is an excise on a transaction that was consummated in Florida when a Florida vendor sold diesel fuel (at rest in Florida tanks) in Florida, and relinquished possession of the fuel in Florida.
In Complete Auto Transit, Quill Corp. and National Bellas Hess, the question was whether one state could require a mail order house in another state to collect use taxes levied on mail order customers residing in the taxing state. The nexus necessary to tax the state’s own residents’ use was never in doubt.
TA occupies a position in the present case analogous to that of the mail order customers in National Bellas Hess and its progeny. See generally Monamotor Oil Co. v. Johnson, 292 U.S. 86, 94, 54 S.Ct. 575, 78 L.Ed. 1141 (1934) (“The distributor who reports the gasoline and pays the tax is required to pass the burden on to the consumer.”) Not holding a Florida license as a dealer in special fuels at the time, TA was treated as a consumer.
Amerada Hess, the licensed dealer in special fuels who, physically present in Florida, collected and remitted the taxes, occupies the position that the mail order houses occupied in National Bellas Hess and its progeny. See § 206.87(2)(a), Fla. Stat. (1993). Amerada Hess has not complained about the imposition or collection of the taxes in dispute.
TA concedes the substantial nexus Florida has with the transactions on which the contested taxes were paid. See Oklahoma Tax Comm’n v. Jefferson Lines, Inc., 514 U.S. 175, 184, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995) (“[A] sale of tangible goods has a sufficient nexus to the State in which the sale is consummated to be treated as a local transaction taxable by that State.”); McGoldrick v. Berwind-White Coal Mining Co., 309 U.S. 33, 49, 60 S.Ct. 388, 84 L.Ed. 565 (1940) (upholding a tax on the sale of coal where the coal was shipped by a seller outside the taxing jurisdiction). The parties stipulated that title passed in Florida. No additional taxpayer nexus requirement exists. “There is ‘nexus’ aplenty here.” D.H. Holmes Co. v. McNamara, 486 U.S. 24, 33, 108 S.Ct. 1619, 100 L.Ed.2d 21 (1988).
B.
Contending that the tax levied by section 206.87, Florida Statutes (1993), is unfairly apportioned, TA argues that the tax fails both the internal consistency and the external consistency tests. “In analyzing these contentions, we are mindful that the central purpose behind the apportionment requirement is to ensure that each State taxes only its fair share of an interstate transaction.” Goldberg v. Sweet, 488 U.S. 252, 260-61, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989).
To be internally consistent, a tax must be structured so that if every State were to impose an identical tax, no multiple taxation would result. 463 U.S., at 169[,103 S.Ct., at 2942] Thus, the internal consistency test focuses on the text of the challenged statute and hypothesizes a situation where other States have passed an identical statute.
Id. at 261, 109 S.Ct. 582 (citing Container Corp. of America v. Franchise Tax Bd., 463 U.S. 159, 169, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983)). “Internal consistency is preserved when the imposition of a tax identical to the one in question by every other State would add no burden to interstate commerce that intrastate commerce would not also bear.” Jefferson Lines, 514 U.S. at 185, 115 S.Ct. 1331.
*1275 The external consistency test asks whether the State has taxed only that portion of the revenues from the interstate activity which reasonably reflects the in-state component of the activity being taxed. Container Corp., supra, 463 U.S., at 169 — 170[, 103 S.Ct., at 2942-2943] We thus examine the in-state business activity which triggers the taxable event and the practical or economic effect of the tax on that interstate activity.
Goldberg, 488 U.S. at 262, 109 S.Ct. 582. “External consistency ... looks not to the logical consequences of cloning, but to the economic justification for the State’s claim upon the value taxed, to discover whether a state’s tax reaches beyond that portion of value that is fairly attributable to economic activity within the taxing State.” Jefferson Lines, 514 U.S. at 185, 115 S.Ct. 1331.
Albeit based on volume, not price, the excise tax at issue here is a species of sales tax. As the state in which the sale occurred, Florida taxed the sale. If every state levied a similar tax on sales of special fuel, each sale would be taxed only once.[4] See Wardair Canada, Inc. v. Florida Dep’t of Revenue, 477 U.S. 1, 9, 106 S.Ct. 2369, 91 L.Ed.2d 1 (1986)(finding “no threat of multiple ... taxation ... since the tax is imposed only upon the sale of fuel, a discrete transaction which occurs in one national jurisdiction only.”). Georgia could not impose a sales tax on this transaction. See McLeod v. J.E. Dilworth Co., 322 U.S. 327, 330, 64 S.Ct. 1023, 88 L.Ed. 1304 (1944). Consequently, the tax passes the test for internal consistency.
Because the sale took place entirely in Florida, the tax also passes the test for external consistency. A sale is a discrete event which a state may tax as long as the sale takes place within its borders. See Wardair Canada, 477 U.S. 1 at 9, 106 S.Ct. 2369, 91 L.Ed.2d 1. The parties to a sale benefit from the amenities and laws of the place of sale, whatever the goods’ ultimate origin or destination. Sales taxes can be imposed “regardless of any activity outside the taxing jurisdiction that might have preceded the sale or might occur in the future.” Jefferson Lines, 514 U.S. at 186, 115 S.Ct. 1331.
That title passed in Florida as the fuel was pumped in Florida made this a Florida sale. See State Tax Comm’n v. Pacific States Cast Iron Pipe Co., 372 U.S. 605, 606, 83 S.Ct. 925, 10 L.Ed.2d 8 (1963) (“[A] State may levy and collect a sales tax, since the passage of title and delivery to the purchaser took place within the State.”); Berwind-White Coal Mining Co., 309 U.S. at 53-54, 60 S.Ct. 388. The parties stipulated that title passed when the fuel was delivered to the common carrier. See Chassaniol v. City of Greenwood, 291 U.S. 584, 587, 54 S.Ct. 541, 78 L.Ed. 1004 (1934); but see Michigan-Wisconsin Pipe Line Co. v. Calvert, 347 U.S. 157, 166-67, *1276 74 S.Ct. 396, 98 L.Ed. 583 (1954) (holding that occupational tax on the gathering of gas violated the commerce clause when the taxable event was the transfer of the gas from the seller’s pipeline to the buyer’s pipeline). This case involves tangible property that was physically present in Florida at the time of the sale.
C.
The special fuel tax does not discriminate against interstate commerce. All purchasers of special fuel pay the same tax. The statute draws no distinction between in-state purchasers and out-of-state purchasers. This is not a case where a facially neutral tax discriminates against interstate commerce in fact. See American Trucking Ass’ns v. Scheiner, 483 U.S. 266, 285-86, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987). All purchasers of special fuel pay tax at the same rate based on the amount of fuel that changes hands. See Goldberg, 488 U.S. at 265-66, 109 S.Ct. 582; Commonwealth Edison Co. v. Montana, 453 U.S. 609, 618, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981). The tax burden is the same for out-of-state purchasers as for in-state purchasers.
D.
The special fuel tax is “fairly related” to services provided by Florida, including the roads over which the fuel was transported to and from the point of sale, police and fire protection, and the “other advantages of a civilized society” that made Florida a suitable place for the transaction, regardless of TA’s intention to export the fuel. See Hartley Marine Corp. v. Mierke, 196 W.Va. 669, 474 S.E.2d 599, 610 (1996) (“It is sufficient for the fairly related test that a taxpayer receives the customary services provided by a state in response to the expectations and demands of a civilized society, such as fire and police protection, opportunities to seek emergency hospital care, food and fuel sources, a trained work force, and judicial access.”).
TA makes much of the fact that the Legislature has statutorily appropriated special fuel tax revenues to pay for building and maintaining roads. But the special fuel tax remains an excise on the sale of fuel. It is not a user fee like a toll paid for the privilege of using the roads. See American Trucking Ass’ns, 483 U.S. at 285-86, 107 S.Ct. 2829. Florida’s excise on the privilege of purchasing special fuel in Florida, see § 206.87(1), Fla. Stat. (1993); Complete Auto Transit, 430 U.S. at 287, 97 S.Ct. 1076 (upholding a tax on the privilege of doing business), does not depend for its validity on where the fuel is ultimately consumed. The taxable event is the sale, not the use, of the fuel.
“If the event is taxable, the proceeds from the tax may ordinarily be used for purposes unrelated to the taxable event.” Jefferson Lines, 514 U.S. at 199, 115 S.Ct. 1331. See Amos v. Gunn, 84 Fla. 285, 363, 94 So. 615, 641 (1922)(“The fact that the 1 cent a gallon sales tax increases the price paid by consumers does not render the tax invalid, even though [some] consumers use motor boats and not the public roads, to which latter the license taxes are applied.”). “Taxes are not paid to the state on a quid pro quo basis.” Hartley Marine Corp., 474 S.E.2d at 610.
In taking advantage of the market Florida provided, TA availed itself of significant public resources. See D.H. Holmes Co., 486 U.S. at 32, 108 S.Ct. 1619. Under the cases, the special fuel tax is “fairly related” to TA’s purchase of diesel fuel in Florida. See Commonwealth Edison Co., 453 U.S. at 626, 101 S.Ct. 2946. A “taxpayer’s receipt of police and fire protection, the use of public roads ..., and the other advantages of a civilized society satisfied the requirement that the tax be fairly related to benefits provided by the State to the taxpayer.” Goldberg, 488 U.S. at 267, 109 S.Ct. 582.
III.
Finally,.TA argues that the special fuel taxes Amerada Hess collected and remit *1277 ted to DOR constitute excessive fines because, if TA had obtained a Florida license as a dealer in special fuel it would, as an exporter, have been exempt from tax under the second sentence of section 206.87(3)(d), Florida Statutes (1993).
We take up first the state constitutional claim. See Traylor v. State, 596 So.2d 957, 962-63 (Fla.1992); State v. Stanley, 754 So.2d 869, 872 (Fla. 1st DCA 2000). When the taxes were collected,[5] Article I, section 17 of the Florida Constitution provided:
Excessive fines, cruel or unusual punishment, attainder, forfeiture of estate, indefinite imprisonment, and unreasonable detention of witnesses are forbidden.
We have held that the state (and federal) constitutional prohibitions against excessive fines bar only payments exacted as punishment. See Busbee v. State, Div. of Retirement, 685 So.2d 914, 917 (Fla. 1st DCA 1996) (“The Excessive Fines provisions are only implicated if the ‘fine’ is a ‘punishment.’ ”).
There is no indication in this record that the special fuel tax was imposed as a punishment. TA paid a generally applicable, revenue-raising, excise tax on a lawful activity.
Taxes imposed upon illegal activities are fundamentally different from taxes with a pure revenue-raising purpose that are imposed despite their adverse effect on the taxed activity. But they differ as well from mixed-motive taxes that governments impose both to deter a disfavored activity and to raise money. By imposing cigarette taxes, for example, a government wants to discourage smoking. But because the product’s benefits — such as creating employment, satisfying consumer demand, and providing tax revenues — are regarded as outweighing the harm, that government will allow the manufacture, sale, and use of cigarettes as long as the manufacturers, sellers, and smokers pay high taxes that reduce consumption and increase government revenue. These justifications vanish when the taxed activity is completely forbidden, for the legitimate revenue-raising purpose that might support such a tax could be equally well served by increasing the fine imposed upon conviction.
Department of Revenue v. Kurth Ranch, 511 U.S. 767, 782, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994) (footnote omitted). The special fuel tax is not a fine within the meaning of the state constitution.
Cases construing the Eighth Amendment do not support TA’s position, either. In Little v. Commissioner of Internal Revenue, 106 F.3d 1445, 1454 (9th Cir.1997), the taxpayer argued that additions to income tax for negligence, substantial understatement of tax liability and late fifing were barred as excessive fines. The court rejected the argument, ruling that the additions to income tax were “purely revenue raising because they serve only to deter noncompfiance with the tax laws by imposing a financial risk on those who fail to do so.” Accord Sears, Roebuck de Puerto Rico, Inc. v. Soto-Rios, 920 F.Supp. 266, 270 (D.P.R.1996) (“Since the ... payment is a legitimate tax, it cannot ... be a fine.”). In requiring that a taxpayer have a Florida special fuel dealer’s license in order to obtain an exemption under the second sentence of section 206.87(3)(d), Florida Statutes (1993), the tax law at issue here evinced no punitive purpose. See Pioneer Oil Co. v. State Dep’t of Revenue, 401 So.2d 1319, 1321 (Fla.1981) (“Exemptions contained in taxing statutes are special favors granted by the legislature .... ”). Unlike United States v. Halper, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), the present case does not involve a statutory penalty. See generally Hudson v. United States, 522 U.S. 93, *1278 99-102, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997); Laura Dietz et al., 21A Am.Jur.2d Criminal Law § 945 (1998).
Affirmed.
ALLEN and LAWRENCE, JJ., CONCUR.

. TA's complaint alleged:
a. [TA] is a nationwide operator of truckstops which are retail distributors of gasoline and diesel fuel outside the State of Florida.
b. Prior to December 11, 1993, the truckstops owned and operated by [TA] were owned and operated by BP Exploration and Oil Company ("BP”).
c. On December 11, 1993, [TA] acquired the truckstop network assets from BP and began operating the truckstops and at the same time signed a service agreement with BP to have their tax department handle the necessary licensing of the newly acquired truckstops and to monitor the collection and payment of all taxes including taxes on gasoline and diesel fuel.
d. [TA] has no operating truckstops in Florida and therefore the need for a Florida Motor Fuel License and Florida Special Fuels License was overlooked. A Florida Motor Fuels license was applied for on March 21, 1994....
e. Special Fuel License # 10-014876 was applied for on September 9, 1994 after [TA] became aware that the Motor Fuel License did not include diesel fuel....
f. A common carrier picked up the diesel fuel at Jacksonville, Florida and delivered the fuel to [TA] "F.O.B. Brunswick, Georgia.” The Georgia tax was paid on the fuel.
g. On November 2, 1994, [TA] requested a refund of taxes in the amount of $981,425.16 and on December 8, 1994, [TA] requested a refund of $374,431.23. These refunds were requested pursuant to Section 206.87(3)(d), Florida Statutes, which exempts the sale of special fuel for export by licensed dealers.
h. On July 1, 1996, [Florida Department of Revenue (DOR) ] denied these requests for refund.. ..

. Since July 1, 1996, section 206.874(l)(d), Florida Statutes (1997), has authorized unlicensed persons to export fuel. See Ch. 95-417, § 75, at 3485, Laws of Fla.

. Before the decision in Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), the sale of diesel fuel to TA could have been deemed a transaction taxable by Florida despite TA's intention to export the fuel to Georgia, on the theory the fuel had come to rest in Florida and had not been committed to a common carrier when sold. See Kosydar v. National Cash Register Co., 417 U.S. 62, 70, 94 S.Ct. 2108, 40 L.Ed.2d 660 (1974); Joy Oil Co. v. State Tax Comm’n, 337 U.S. 286, 288, 69 S.Ct. 1075, 93 L.Ed. 1366 (1949) ("The circumstances which tended ... to establish petitioner’s intent to export the gasoline and the fact that the gasoline was eventually exported are not enough, by themselves, to confer immunity from local taxation.”); Champlain Realty Co. v. Town of Brattleboro, 260 U.S. 366, 376-77, 43 S.Ct. 146, 67 L.Ed. 309 (1922).
Where property has come to rest within a State, being held there at the pleasure of the owner, for disposal or use, so that he may dispose of it either within the State, or for shipment elsewhere, as his interest dictates, it is deemed to be a part of the general mass of property within the State and is thus subject to its taxing power.
State of Minnesota v. Blasius, 290 U.S. 1, 10, 54 S.Ct. 34, 78 L.Ed. 131 (1933). "Property thus withdrawn from transportation, whether intrastate or interstate, until restored to a transportation movement interstate, has often been held to be subject to local taxation." Federal Compress & Warehouse Co. v. McLean, 291 U.S. 17, 21, 54 S.Ct. 267, 78 L.Ed. 622 (1934). See C.V. Floyd Fruit Co. v. Florida Citrus Comm'n, 128 Fla. 565, 567, 571, 175 So. 248, 249, 250 (Fla.1937) (upholding an excise imposed upon citrus fruit "first handled in the primary channel of trade,” defined to include "sale [or] delivery for shipment”); see generally Amos v. Gunn, 84 Fla. 285, 362, 94 So. 615, 640 (1922).
At one time a crucial question was whether a taxable event occurred within or without the stream of interstate commerce. See, e.g., Federal Compress & Warehouse Co., 291 U.S. at 21-22, 54 S.Ct. 267 (upholding state license taxes based on the number of cotton bales compressed per annum even though the cotton was baled at the taxpayer’s warehouse which had been designated an interstate rail carrier's depot, on grounds that "it [was] not within the power of the parties, by the descriptive terms of their contract, to convert a *1273 local business into an interstate commerce business protected by the interstate commerce clause”).
But the United States Supreme Court no longer takes the formalistic view that the "unconditional commitment of property to a common carrier for transportation in regular course to another state or country ... place[s] it in the stream of interstate or foreign commerce, so as to render it immune from local taxation.” C.R. McCorkle, Annotation, Property Destined for, or in Course of, Removal From State as Subject to Taxation Therein, 11 A.L.R.2d 938 § 4 at 944 (1950). In adopting the Complete Auto Transit test, see generally 430 U.S. at 279-287, 97 S.Ct. 1076, the Court held that states may tax activity that is part of interstate commerce. The Court explained in D.H. Holmes Co., Ltd. v. McNamara, 486 U.S. 24, 30-31, 108 S.Ct. 1619, 100 L.Ed.2d 21 (1988) that
Complete Auto abandoned the abstract notion that interstate commerce "itself” cannot be taxed by the States. We recognized that, with certain restrictions, interstate commerce may be required to pay its fair share of state taxes. Accordingly, in the present case, it really makes little difference for Commerce Clause purposes whether appellant's catalogs "came to rest” in the mailboxes of its Louisiana customers or whether they were still considered in the stream of interstate commerce. This distinction may be of some importance for other purposes (in determining, for instance, whether a "taxable moment” has occurred, see [McNamara v. D.H. Holmes Co., Ltd.,] 505 So.2d[102], at 105[(La.App. 4 Cir. 3/16/87)]), but for Commerce Clause analysis it is largely irrelevant.
See also Tunica-Biloxi Tribe v. State of Louisiana, 964 F.2d 1536, 1540-41 & n. 12 (5th Cir. 1992) (holding irrelevant, in relation to sales taxes on tribal automobile purchases, whether the automobiles were delivered in Louisiana or to the reservation); Diamond Shamrock Refining and Marketing Co. v. Nueces County Appraisal Dist., 876 S.W.2d 298, 301 (Tex.1994). Whether the fuel was within or without the stream of commerce, Florida could levy the special fuel tax on the transactions at issue here.

. States can levy taxes on sales occurring within their borders, even though other states may impose use taxes as to the same goods. "A sales tax is a tax on the freedom of purchase. ... A use tax is a tax on the enjoyment of that which was purchased.” See McLeod v. J.E. Dilworth Co., 322 U.S. 327, 330, 64 S.Ct. 1023, 88 L.Ed. 1304 (1944).
Use taxes are said to be "subordinate” to sales taxes. See Oklahoma Tax Comm'n v. Jefferson Lines, Inc., 514 U.S. 175, 184, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995). As a tax on sales, the tax here has "primacy” over use taxes imposed by other states in the sense that the Legislature may assume use tax statutes provide for appropriate credits.
[I]n taxing sales [the taxing State] may rely upon use-taxing States to [provide a credit for related taxes paid elsewhere]. This is merely a practical consequence of the structure of use taxes as generally based upon the primacy of taxes on sales, in that use of goods is taxed only to the extent that their prior sale has escaped taxation.
Jefferson Lines, 514 U.S. at 194, 115 S.Ct. 1331. The possibility that another state's use tax might result in multiple taxation, if the other state did not allow appropriate credits, does not render the initial sales tax double taxation.
Even if Georgia imposed a tax on the use of the fuel in Georgia, without allowing credit for sales taxes paid in Florida, it would be the Georgia levy, not the special fuel tax at issue here, which would violate the ban against multiple taxation.

. The text remains the same today despite an intervening, ultimately unsuccessful attempt at amending it. See Armstrong v. Harris, 25 Fla. L. Weekly S656,-So.2d-, 2000 WL 1260014 (Fla. Sept. 7, 2000).