STUART, Justice.
White-Spunner Construction, Inc., and Hartford Fire Insurance Company (“Hartford”) appeal the summary judgment and the award of attorney fees in favor of Construction Completion Company, LLC (“CCC”), in CCC’s action alleging that White-Spunner failed to pay it for labor and materials it provided as a subcontractor to White-Spunner in the fall of 2008 in conjunction with White-Spunner’s work as the general contractor on a public-works project at Auburn University (case no. 1101285). CCC cross-appeals, arguing that the Mobile Circuit Court erred in dismissing its bad-faith and fraud claims against Hartford, which had issued payment bonds to White-Spunner for the project (case no. 1101340). We reverse the judgment in case no. 1101285 and dismiss the appeal in case no. 1101340.
I.
In May 2008, White-Spunner, a licensed general contractor, signed two contracts worth approximately $99 million to construct eight four-story dormitory buildings at Auburn University (“the Auburn project”). As required by § 39-l-l(a), Ala. Code 1975, White-Spunner subsequently obtained two payment bonds from Hartford, one of which would compensate Auburn in the event White-Spunner failed to perform under the contract, the other of which would be used to compensate subcontractors and suppliers in the event White-Spunner failed to do so in a timely fashion.
After construction on the Auburn project began, White-Spunner subcontracted with CCC, which also held a general contractor’s license, to provide labor, materials, and services in connection with the framing of the buildings being constructed. Under the terms of their agreement, CCC agreed to provide workers for the project and White-Spunner agreed to pay CCC a set fee for each man-hour worked pursuant to the following schedule: $42 per hour for a “lead man,” $32 per hour for an experienced carpenter, and $22 per hour for a carpenter’s helper. In its proposal setting these terms, CCC further stated:
“At the rates listed, we will be able to provide the best labor with the best tools for this job. These rates include any and all supervision, labor, overtime labor, tools, transportation, per-diem, and lodging. We will supply nails to complete the job, but will be submitting those receipts with our billing to be reimbursed.”
CCC also requested that it be paid every two weeks. An executed contract memorializing these terms is not included in the record; however, neither party disputes that these were the essential terms of their agreement. It is also undisputed that either party could terminate their relationship at will.
Subsequently, CCC subcontracted with Buena Vista Construction, LLC (“Buena Vista”), a Florida company, for Buena Vista to provide CCC with the workers CCC *783 needed to fulfill its agreement with White-Spunner. Although it appears that no written contract was executed between Buena Vista and CCC, Buena Vista did provide CCC with a certificate of insurance establishing that it held commercial general-liability and workers’ compensation policies. Invoices in the record submitted by Buena Vista to CCC also indicate that CCC generally paid Buena Vista between $19.50 and $21.50 for each man-hour worked. The workers provided CCC by Buena Vista wore CCC uniforms on the construction site and, CCC alleges, were at all times under the direct control of CCC’s owner Richard Jensen and/or CCC’s direct employee, Richard Able. White-Spunner apparently had no knowledge of CCC’s separate agreement with Buena Vista. It is undisputed that Buena Vista was not licensed as a contractor in Alabama during this time.
For some time, it appears that there were no problems with this arrangement. Workers would arrive on the job site each day and sign in and out on daily time sheets that were also signed by White-Spunner superintendents. Copies of the daily time sheets were apparently then retained by White-Spunner and by the supervisors among the workers supplied to CCC by Buena Vista. Buena Vista would then submit weekly summaries as well as invoices to CCC based on the daily time sheets, and CCC would then process this information and prepare invoices that were submitted to White-Spunner every two weeks, payment being due two weeks thereafter. Invoices received by White-Spunner were initially reviewed by Jim Schjott, White-Spunner’s general superintendent for the Auburn project, and then ultimately approved by Tom Clutter, White-Spunner’s project executive for the Auburn project.
A dispute between CCC and White-Spunner first arose in October 2008 when White-Spunner made only partial payment on certain invoices based on a belief that the invoices submitted could not be reconciled with the progress of the Auburn project. This dispute was apparently never resolved; however, CCC continued working on the Auburn project, and White-Spunner thereafter paid at least some subsequently submitted invoices in full. By December 8 however, CCC was apparently either unwilling or unable to keep working without being paid the balance of the October invoices — $255,859.48—and it accordingly ceased work on the Auburn project.[1] On December 12, 2008, CCC sent White-Spunner a letter from its attorney demanding $698,468.93 as payment on all outstandinginvoices.
In an affidavit later submitted in conjunction with White-Spunner and Hartford’s motion opposing CCC’s motion for a partial summary judgment, Clutter described the genesis of the dispute with CCC as follows and claimed never to have received the November 28 and December 10 invoices — totaling $298,482.00 and $144,127.45, respectively — prior to CCC’s initiating this litigation:
“4. During the month of October 2008, a series of invoices were submitted by [CCC] which were not justified , by the descriptions of work provided with the invoices or the observed progress of work on the project. Upon receiving these invoices and noting the discrepancies, I disputed these invoices through numerous meetings with [CCC’s] princi *784 pal, Richard Jensen. I expressed my concerns to Mr. Jensen, asked him to provide additional documentation or explanation to account for the disparity between the amount of work which had been billed compared with the amount of work which had actually been performed. Where the progress on the project justified payment, payment of the undisputed amounts was made. [CCC] did not submit the additional justification as requested, although it did continue to work and its bills were paid.
“5. During this process I had numerous conversations with general superintendent Jim Schjott to clarify his role as an initial reviewer of [CCC’s] invoices to make sure they were consistent with work which was being performed. It was my impression that the conversations I had with both Rich Jensen and Jim Schjott led directly to the submission of subsequent invoices which I felt accurately reflected work done and progress made on the project.
“6. During the course of [CCC’s] work on this project the original invoices were submitted to the White-Spunner project office at Auburn. Invoices were not submitted to the Mobile office because the necessary review of project progress and daily sign-in documentation was conducted on the job site at Auburn. Once the invoices were received they were initially reviewed by general superintendent Jim Schjott and submitted to me for final review and approval.
“7. Jim Schjott left the Auburn project before the Thanksgiving weekend of 2008 and did not return until December 8. Upon his return, Mr. Schjott submitted his retirement from employment with White-Spunner Construction. Mr. Schjott’s request for retirement was accepted and his duties on the Auburn project were assumed by others pending his retirement.
“8. During the time Mr. Schjott was away from the project I was made aware of all invoices which were submitted for payment. I did not receive or review any invoices from [CCC] after Thanksgiving 2008. White-Spunner has no record of these invoices being submitted during the course of [CCC’s] work on this project. I have been shown invoices in the course of this lawsuit dated November 28 and December 10, 2008. This is the first time I have seen these invoices.”
White-Spunner did not make any payments to CCC in response to the December 12 letter, and, on December 23, 2008, CCC sent Hartford a letter demanding payment on White-Spunner’s payment bond pursuant to § 39-1-1, Ala.Code 1975.[2] Hartford requested additional information from CCC so that it could investigate the claim, and, on February 5, 2009, CCC sent Hartford copies of daily time sheets, invoices, and other information. *785 On February 18, 2009, after receiving no payment from either White-Spunner or Hartford, CCC filed the instant action in the Mobile Circuit Court.
In its initial complaint, CCC named White-Spunner, Hartford, and Buena Vista as defendants. It generally alleged that White-Spunner had breached its contract with CCC and that White-Spunner and Hartford had violated § 39-1-1, but it also disputed the amounts claimed by Buena Vista in invoices it had submitted to CCC and sought a declaratory judgment setting forth the amount it owed Buena Vista. CCC subsequently amended its complaint to assert a promissory-fraud claim against White-Spunner and bad-faith-failure-to-pay and fraud claims against Hartford as well.
White-Spunner and Hartford filed separate answers to the complaint, and White-Spunner also asserted a counterclaim against CCC alleging that CCC had performed unacceptable work and had, in fact, breached its contract with White-Spunner. CCC denied that claim in its own subsequently filed answer. Buena Vista thereafter filed its answer, asserting a counterclaim against CCC and alleging that it had entered into an agreement with CCC to “provide materials, labor, and other various construction services” for the Auburn project and that CCC had breached its agreement to compensate Buena Vista for those items and services. Buena Vista also asserted cross-claims against White-Spunner and Auburn University, alleging that they had benefited from the work and materials provided by Buena Vista for which it had not been paid, and against Hartford as the issuer of the payment bond on the Auburn project.
On August 27, 2010, CCC moved for a summary judgment against Buena Vista, arguing that Buena Vista was an unlicensed-contractor at the time it performed work for CCC and that, accordingly, it could not recover any amounts allegedly still owed it by CCC because their contract was void. See, e.g., Twickenham Station, Inc. v. Beddingfield, 404 So.2d 43, 45 (Ala.1981) (stating that it is illegal for an unlicensed contractor to contract to perform the work of a contractor as defined in § 34-8-1, Ala.Code 1975, and that any such contract is void and unenforceable). Buena Vista opposed the motion, arguing that it had not acted as a contractor; rather, it argued that it had only provided laborers to CCC and stated that it had never engaged in construction activities, had never had supervisory duties, and had never superintended laborers as part of the Auburn project.
CCC and Buena Vista thereafter reached an agreement to dismiss the claims they had asserted against each other and filed a joint stipulation of dismissal with the trial court.[3] White-Spunner and Hartford objected to the dismissal of Bue-na Vista, and White-Spunner later amended its counterclaim against CCC to seek a declaratory judgment .regarding the rights of the parties in light of the alleged illegal and unenforceable contract between CCC and Buena Vista. On October 26, 2010, the trial court granted CCC and Buena Vista’s joint motion to dismiss the claims they had asserted against each other, as well as Buena Vista’s motion to dismiss its claims against Auburn University, White-Spunner, and Hartford. On November 4, 2010, the trial court also dismissed White-Spunner’s counterclaim seeking a declara *786 tory judgment as to the rights of the parties in light of the alleged illegal contract between CCC and Buena Vista. On November 8, 2010, on Hartford’s motion, the trial court dismissed CCC’s bad-faith-failure-to-pay and fraud claims against Hartford.
CCC, on the one hand, and White-Spun-ner and Hartford, on the other, thereafter filed competing motions for a summary judgment. On February 24, 2011, the trial court entered a summary judgment in favor of CCC, holding that White-Spunner had failed to timely pay CCC amounts it was due under their contract for the disputed October 2008 invoices and the unpaid November 28, 2008, and December 10, 2008, invoices, awarding CCC a total principal sum of $698,468.98 and interest in the amount of $127,462.27. The trial court also dismissed White-Spunner’s remaining counterclaim against CCC. The trial court further granted CCC leave to prove attorney fees because such fees were specifically authorized by § 39-1-1. CCC subsequently submitted evidence supporting its claim for attorney fees, and, on April 21, 2011, the trial court held a hearing on that claim.
On May 11, 2011, the trial court entered a final judgment in favor of CCC and against White-Spunner and Hartford, reaffirming the $825,931.20 in damages awarded CCC in the trial court’s February 24 order and awarding CCC an additional $289,075.90 in attorney fees. The trial court also awarded CCC an additional $5,661.59 for expenses, but it noted that only White-Spunner — not Hartford — was liable for that amount because § 39-1-1 contained no provision for recovering expenses from a surety. White-Spunner and Hartford’s subsequent motion to alter, amend, or vacate that judgment was denied by the trial court on June 27, 2011, and, on August 2, 2011, White-Spunner and Hartford filed their notice of appeal to this Court. On August 9, 2011, CCC filed a cross-appeal, arguing that the trial court had erred in dismissing its bad-faith-failure-to-pay and fraud claims against Hartford.
II.
White-Spunner and Hartford argue that the trial court erred in entering a summary judgment in favor of CCC. We review this argument pursuant to the following standard:
“This Court’s review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala.2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala.2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wilson v. Brown, 496 So.2d 756, 758 (Ala. 1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce ‘substantial evidence’ as to the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); Ala. Code 1975, § 12-21-12.”
Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038-39 (Ala.2004).
III.
White-Spunner and Hartford argue that the trial court erred in entering a summary judgment in favor of CCC because, *787 they allege, CCC is effectively suing them to recover money it claims it was owed as a result of work it hired Buena Vista to complete. However, White-Spunner and Hartford argue, because Buena Vista was an unlicensed contractor, its contract with CCC was illegal and void, and CCC accordingly cannot prevail on its claims. See, e.g., Ex parte W.D.J., 785 So.2d 390, 393 (Ala.2000) (“Moreover, this Court has held that ‘[a] person cannot maintain a cause of action if, in order to establish it, he must rely in whole or in part on an illegal or immoral act or transaction to which he is a party.’ Hinkle v. Railway Express Agency, 242 Ala. 374, 378, 6 So.2d 417, 421 (1942). In Oden v. Pepsi Cola Bottling Co., 621 So.2d 953 (Ala.1993), this Court stated that the purpose of the Hin-kle rule is to ensure that ‘ “those who transgress the moral or criminal code shall not receive aid from the judicial branch of government.” ’ ” 621 So.2d at 955 (emphasis omitted)). CCC disputes that its contract with Buena Vista was illegal; however, it argues that White-Spunner and Hartford have no standing to challenge the status of that contract regardless of the ultimate determination of its legality. Before considering the substantive issue of the legality of the contract, we first consider CCC’s standing argument.
CCC argues that White-Spunner and Hartford are strangers to CCC’s contract with Buena Vista and that they accordingly may not attack its legality:
“White-Spunner is a stranger to CCC’s contract with Buena Vista; neither a party nor a third-party beneficiary thereof. ‘It is well settled law that “one not a party to, or in privity with a contract, cannot sue for its breach.’” Bernals, Inc. v. Kessler-Greystone, LLC, 70 So.3d 315, 319 (Ala.2011); Dunning v. New Eng. Life Ins. Co., 890 So.2d 92, 97 (Ala.2003) (holding standing to sue under a contract requires plaintiff to be in privity or an intended third-party beneficiary); Twine v. Liberty Nat’l Life Ins. Co. 311 So.2d 299, 305 (Ala.1975) (standing to sue on contract must be based on privity); [and] Weathers Auto Glass, Inc. v. Alfa Mut. Ins. Co., 619 So.2d 1328, 1329 (Ala.1993) (to be a third-party beneficiary, party must show contracting parties intended direct benefit). [White-Spunner and Hartford’s] lack of standing bars any attack on [the] CCC/[Buena Vista] contract by White-Spunner, whether called declaratory judgment or as affirmative defense.”
CCC’s brief, pp. 40-41. White-Spunner and Hartford dispute CCC’s claim that White-Spunner was not a third-party beneficiary to the contract between CCC and Buena Vista; regardless, however, they argue that the cases cited by CCC are inapposite because, they argue, they are not asserting claims “under” a contract or based on a breach of that contract. Rather, they argue, their argument regarding the legality of the contract between CCC and Buena Vista is consistent with the well settled principle of law that “ ‘a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out....’” Thompson v. Wiik, Reimer & Sweet, 391 So.2d 1016, 1020 (Ala.1980) (quoting 17 C.J.S. Contracts § 272 (1963)). In support of their argument that they need not have been a party to the alleged illegal contract to raise the issue of the validity of the contract in the instant lawsuit, White-Spunner and Hartford cite Bankers & Shippers Insurance Co. of New York v. Blackwell, 255 Ala. 360, 51 So.2d 498 (1951). In Blackwell, the plaintiff contracted to transport a cargo of lawnmowers in interstate commerce; however, after those lawnmowers were damaged in transit, the plaintiffs insurer refused to make payment, notwithstanding *788 the existence of a presumptively valid transportation policy it had issued the plaintiff. After the trial court entered a judgment in the plaintiffs favor, this Court reversed that judgment because the plaintiff was not properly licensed to transport the lawnmowers, stating:
“Another statement by this Court is ‘that contracts specially prohibited by law, or the enforcement of which violated a law, or the making of which violated the law which was enacted for regulation and protection, as distinguished from a law created solely for revenue purposes, is void and nonenforceable.... Whenever a party requires the aid of an illegal transaction to support his case, he cannot recover.’ Ellis v. Batson, [177 Ala. 313, 317, 58 So. 193, 194 (1912)]; Pope v. Glen[s] Falls Ins. Co., 136 Ala. 670, 34 So. 29 [(1903)]. See, also, 9 A.L.R.2d 184.
“Plaintiffs contract of insurance was not prohibited by law. While the Motor Transportation Act is for regulation and protection, the insurance here involved did not violate that Act. But we think plaintiff could not establish his case without reference to or in reliance upon an illegal act or transaction within the principle declared above. This is for the following reason: his only insurable interest is dependent upon an illegal transaction made so by an act, which was enacted for regulation and protection and not for revenue. His contract to transport the lawnmowers, and the transportation of them as a contract carrier in interstate commerce, was illegal and subjected him to a penalty by virtue of such an act of Congress, 49 U.S.C.A. §§ 309 and 322, which was a regulation for the protection of the public.”
255 Ala. at 366, 51 So.2d at 502. The rationale of Blackwell applies in this case as well.[4] There is no allegation that CCC’s contract with White-Spunner was illegal; however, like the plaintiff in Blackwell, CCC is alleged to have entered into an illegal contract with a third party that was directly related to the subject of the legal contract. We held in Blackwell that the party to the legal contract that was a stranger to the illegal contract could avoid making payment to the party involved in both the legal and illegal contracts — notwithstanding the fact that its own contract with that party was valid — if the latter party cannot “establish [its] case without reference to or in reliance upon [the alleged] illegal act or transaction.” 255 Ala. at 366, 51 So.2d at 502. Accordingly, White-Spunner and Hartford may raise the issue of the validity of the contract between CCC and Buena Vista without violating any standing requirements.
We therefore turn to the issue whether CCC’s contract with Buena Vista was, in fact, illegal. In considering this issue, the trial court held that the contract was not illegal because, it reasoned, Buena Vista was not required to be licensed to perform the service it was contracted to perform. The trial court stated:
“[CCC] is a licensed general contractor in Alabama and was legally authorized to perform its contract with White-Spunner. [CCC] directly employed many of the workers used in performance of its contract. [CCC] used Buena Vista as a labor broker to provide staff- *789 mg services by sending temporary workers to supplement [CCC’s] workforce as needed from time to time on the [Auburn] project. Some of these temporary workers were billed at the $42.00 per hour [supervisor] rate. Buena Vista was not a licensed contractor and, in the aggregate, it was paid more than $50,000.00 by [CCC]. Buena Vista did not contract with White-Spunner.
“[CCC] entered into an agreement with Buena Vista for Buena Vista to provide some of the workers required by [CCC’s] contract with White-Spunner. The court finds Buena Vista was a labor broker; providing temporary employees to [CCC] as some of the workforce required by the contract between White-Spunner and [CCC]. As the licensed general contractor subcontracted to White-Spunner, [CCC] directed these temporary workers in their performance while on the [Auburn] project. The court finds it was [CCC], not Buena Vista, that had the right of control and actually exercised its right of control over the activities of these loaned workers while on the projects. [CCC] directed the activities of the loaned workers in the same manner as it directed the activities of its direct employees.
“Under the facts of this case, the court finds Buena Vista was not required to be a licensed contractor under [§ 34-8-1]. The defendants failed to produce sufficient admissible evidence to establish their affirmative defense that [CCC] is barred from recovery because Buena Vista was not a licensed contractor in Alabama. [White-Spunner and Hartford’s] motion for summary judgment based on the affirmative defense of illegality is denied.”
White-Spunner and Hartford argue that the trial court’s rationale is erroneous for two reasons: (1) the language of § 34-8-1, Ala.Code 1975, is unambiguous and contains no “labor-broker” exception; and (2) there is a genuine issue of material fact as to whether Buena Vista acted as a mere labor broker based on the level of involvement of Buena Vista and CCC in the day-to-day operations at the work site and the fact that CCC required Buena Vista to provide proof that it held a commercial general-liability insurance policy. In effect, White-Spunner and Hartford argue, “if there was a mere ‘labor broker’ involved, it was CCC. [Buena Vista] was engaged in construction; CCC in markups of [Buena Vista’s] invoices.” White-Spunner and Hartford’s brief, p. 22.
We begin our examination of the labor-broker issue by looking to § 34-8-1 et seq., Ala.Code 1975, the chapter of the Alabama Code governing the licensing of contractors. This Court succinctly described its approach when interpreting statutes in DeKalb County LP Gas Co. v. Suburban Gas, Inc., 729 So.2d 270, 275-76 (Ala.1998):
“In determining the meaning of a statute, this Court looks to the plain meaning of the words as written by the legislature. As we have said:
“ ‘ “Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.” ’
“Blue Cross & Blue Shield v. Nielsen, 714 So.2d 293, 296 (Ala.1998) (quoting IMED Corp. v. Systems Eng’g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992)); see also Tuscaloosa County Comm’n v. Deputy Sheriffs’ Ass’n, 589 So.2d 687, *790 689 (Ala.1991); Coastal States Gas Transmission Co. v. Alabama Pub. Serv. Comm’n, 524 So.2d 357, 360 (Ala.1988); Alabama Farm Bureau Mut. Cas. Ins. Co. v. City of Hart selle, 460 So.2d 1219, 1223 (Ala.1984); Dumas Bros. Mfg. Co. v. Southern Guar. Ins. Co., 431 So.2d 534, 536 (Ala.1983); Town of Loxley v. Rosinton Water, Sewer, & Fire Protection Auth., Inc., 376 So.2d 705, 708 (Ala.1979). It is true that when looking at a statute we might sometimes think that the ramifications of the words are inefficient or unusual. However, it is our job to say what the law is, not to say what it should be. Therefore, only if there is no rational way to interpret the words as stated will we look beyond those words to determine legislative intent. To apply a different policy would turn this Court into a legislative body, and doing that, of course, would be utterly inconsistent with the doctrine of separation of powers. See Ex parte T.B., 698 So.2d 127, 130 (Ala.1997).”
Our ultimate inquiry then, with regard to the labor-broker issue, is whether Buena Vista’s agreement with CCC required it to engage in activities that required a license under § 34-8-1 et seq. Section 34-8-1 (a) defines general contracting as follows:
“For the purpose of this chapter, a ‘general contractor’ is defined to be one who, for a fixed price, commission, fee, or wage undertakes to construct or superintend or engage in the construction, alteration, maintenance, repair, rehabilitation, remediation, reclamation, or demolition of any building, highway, sewer, structure, site work, grading, paving or project or any improvement in the State of Alabama where the cost of the undertaking is fifty thousand dollars ($50,000) or more, shall be deemed and held to have engaged in the business of general contracting in the State of Alabama.”
A “subcontractor” is defined as one who engages in any of those same activities while under contract to a general contractor or another subcontractor. See § 34-8-1(c). Section 34-8-7(c), Ala.Code 1975, makes clear that, with some exceptions not relevant in this case, “a subcontractor, as defined in subsection (c) of Section 34-8-1, is subject to and shall comply with all the provisions of this chapter as specified for general contractor.... ” Both general contractors and subcontractors are required to go through a licensing process, and § 34-8-6, Ala.Code 1975, specifically provides that “[a]ny person, firm, or corporation not being duly authorized who shall engage in the business of general contracting in this state ... shall be deemed guilty of a Class A misdemeanor.... ”
In this case, it is undisputed that Buena Vista contracted with CCC to provide CCC with Buena Vista employees and that those employees were then used both to frame buildings and to supervise other Buena Vista employees working on the Auburn project. Importantly, White-Spunner and Hartford emphasize, it is undisputed that Buena Vista employees did not work simply as consultants, equipment installers, or performers of menial labor. Rather, framing is specifically recognized as a construction activity by the Licensing Board for General Contractors. See Ala. Admin. Code (Licensing Board for General Contractors), Regulation 230-X-1-.27. We must therefore conclude, in connection with the Auburn project, that Buena Vista “under[took] to construct or superintend or engage in the construction ... of [a] building ... in the State of Alabama where the cost of the undertaking is fifty thousand dollars ($50,000) or more.... ” § 34-8-1 (a). Or, as CCC itself stated in its motion seeking a summary judgment against Buena Vista before they agreed to dismiss their claims against each other: “In the instant case, it is undisputed that *791 Buena Vista undertook work in excess of $50,000 involving the construction, modification or remediation of buildings in Auburn, Alabama, and thus falls within the definition of a general contractor in § 34-8-1 et seq.”[5]
CCC nevertheless argues that Buena Vista did not engage in contracting because, it argues, the employees supplied by Buena Vista effectively became CCC employees and employees of a licensed contractor are not required to be licensed themselves. Cooper v. Johnston, 283 Ala. 565, 569, 219 So.2d 392, 395 (1969) (noting that an individual accused of being unlicensed contractor “was not connected with [the licensed contracting company] as an officer, partner or employee”). In support of this argument, CCC cites multiple cases involving workers’ compensation law in which employees provided to a company by an employment agency are held to be employees of both the “general employer,” i.e., the employment agency, and the “special employer,” i.e., the company to which the employees are assigned. See, e.g., Marlow v. Mid South Tool Co., 535 So.2d 120, 123 (Ala.1988) (“In three decisions, beginning in 1983, this Court has established, for workmen’s compensation purposes, that a temporary services employee is the employee of both his or her general employer (i.e., the employment agency) and his or her special employer (i.e., the employer to which the employment agency assigned the employee to work).”). However, CCC cites no cases where this principle has been applied outside the workers’ compensation context, and we are not inclined to read a labor-broker exception into the licensing statutes on the basis of the special-employee doctrine where the language is otherwise unambiguous. Section 34-8-7(a), Ala.Code 1975, specifically lists certain activities that might be encompassed within the definition of general contracting in § 34-8-1, but are nevertheless exempted from licensing requirements. Those exemptions include:
“(1) The practice of general contracting, as defined in Section 34-8-1, by an authorized representative or representatives of the United States Government, State of Alabama, incorporated town, city, or county in this state, which is under the supervision of a licensed architect or engineer provided any work contracted out by the representative shall comply with the provisions of this chapter for ‘general contractor.’
“(2) The construction of any residence or private dwelling.
“(3) A person, firm, or corporation constructing a building or other improvements on his, her, or its own property provided that any of the work contracted out complies with the definition in this chapter for ‘general contractor.’
“(4) The installation, repair, maintenance, or removal of facilities, equipment, or systems used in or substantially related to the generation, transmission, or distribution of electric power, natural gas, or telecommunications in an emergency by a *792 utility regulated by the Public Service Commission, or any entity engaged in the generation, transmission, or distribution of electric power, natural gas, or telecommunications, or any of their respective general contractors or subcontractors, provided the work is performed under the supervision of a licensed architect or engineer. For purposes of this subdivision, the term ‘emergency1 is defined as a situation whereby service to the consumer has been interrupted or may be interrupted if work to remedy the emergency is not performed and completed within 60 days, and such other situations that are determined to be an emergency in the discretion of the board.
“(5) The repair, maintenance, replacement, reinstallation, or removal of facilities, equipment, or systems used in or substantially related to the generation, transmission, or distribution of electric power, natural gas, or telecommunications on a routine, regular, or recurring basis by a utility regulated by the Public Service Commission or any entity engaged in the generation, transmission, or distribution of electric power, natural gas, or telecommunications or any of their respective general contractors or subcontractors, provided the work is performed under the supervision of a licensed architect or engineer.
“(6) Routine or regular maintenance, repair, replacement, reinstallation, or removal of equipment, specialized technological processes, or equipment facility systems as determined by the board with regard to scope, frequency, and speciality of the work to be performed.”
No labor-broker exemption is listed. “Under the principle expressio unius est ex-clusio alterius, the express inclusion of one exception implies the exclusion of others.” Sustainable Forests, LLC v. Alabama Dep’t of Revenue, 80 So.3d 270, 273 (Ala.Civ.App.2011) (citing Ex parte Haponski, 395 So.2d 971, 972 (Ala.1981)).[6]
The Supreme Court of West Virginia has considered the issue now before us and come to a similar conclusion. In Personnel Temporary Services v. West Virginia Division of Labor Contractor Licensing Board, 197 W.Va. 149, 475 S.E.2d 149 (W.Va.1996), the Supreme Court of West Virginia heard the appeal of Personnel Temporary Services (“PTS”), an employment agency that had been adjudged by the trial court to be a contractor requiring a license as a result of its providing laborers to a subcontractor tasked with demolishing a closed restaurant. That Court held as follows:
“The narrow issue presented by this case is whether a business entity that refers laborers to a properly licensed contractor for employment while retaining all payroll functions for the laborers referred is a contractor as defined under the West Virginia Contractor Licensing Act, W. Va.Code 21-11-1 to -19 (1991), and therefore, subject to the licensing requirements therein.
“Because the issue on appeal requires an interpretation of the provisions of the West Virginia Contractor Licensing Act, we are presented with a purely legal question, which is subject to a de novo review. Syllabus Point 1, Appalachian Power Co. v. State Tax Dep’t, 195 W.Va. 573, 466 S.E.2d 424 (1995). See Hartley
*793 Marine Corp. v. Mierke, 196 W.Va. 669, 673, 474 S.E.2d 599, 603 (1996).
“The West Virginia Contractor Licensing Act broadly defines who is considered a contractor and therefore, subject to the Act’s licensing requirements. The definition section of the Act, W. Va.Code 21 — 11—3(c) (1991), provides:
“ ‘ “Contractor” means a person who in any capacity for compensation, other than as an employee of another, undertakes, offers to undertake, purports to have the capacity to undertake, or submits a bid to construct, alter, repair, add to, subtract from, improve, move, wreck or demolish any building, highway, road, railroad, structure or excavation associated with a project, development or improvement, or to do any part thereof, including the erection of scaffolding or other structures or works in connection therewith, where the cost of the undertaking is one thousand dollars or more.’
“The pertinent legislative rule promulgated under the West Virginia Contractor Licensing Act, 28 C.S.R. 2 § 3.9 (1996), is consistent with the statutory definition of a contractor, and also adds, in pertinent part:
“ ‘Contractor or “contracting activity” also means and includes the furnishing of work, or both materials and work, for another (by a sole contractor, general contractor, prime contractor or subcontractor) in fulfillment of a contract for the construction, alteration, repair, decoration or improvement of a new or existing building or structure, or any part thereof, or for the alteration, capital improvement or development of real property.... The terms “contractor” and “contracting” are synonymous.’
“In this case, the activities of PTS fall within the statutory definition of a contractor because PTS supplied laborers to perform work demolishing a building for another, the cost of which exceeded one thousand dollars. W. Va.Code 21-ll-3(c) (1991) provides, in pertinent part, that a ‘ “[cjontractor” means a person who in any capacity ... offers to undertake ... to ... demolish any building ... associated with a project ... or works in conjunction therewith, where the cost of the undertaking is one thousand dollars or more.’ The legislative rule, 28 C.S.R. 2 § 3.9, provides, in pertinent part, that a ‘[cjontractor ... means and includes the furnishing of work ... in fulfillment of a contract for the ... alteration, capital improvement or development of real property....’
“Our determination of the inclusive nature of the definition of a contractor is also shown by the nine narrow exceptions to the definition provided in W. Va.Code 21-ll-6(c)(1991). We find none of these narrow exceptions applies in this case because PTS did not: (1) work for the government (see subsection (1) of W. Va.Code 21-ll-6(c) (1991)); (2) furnish a product that is not a permanent fixed part of the structure (see subsection (2)); (3) personally perform agricultural work (see subsection (3)); (4) furnish materials (see subsection (4)); (5) work as a regulated public utility (see subsection (5)); (6) perform emergency repair work on equipment (see subsection (6)); (7) perform work as ‘an employer’s regular employees’ (see subsection (7)); (8) personally perform work on property it owns (see subsection (8)); or (9) prepare construction plans (see subsection (9)).
“Our traditional rule of statutory construction is stated in Syllabus Point 1 of State ex rel Fox v. Board of Trustees of the Policemen’s Pension or Relief Fund *794 of the City of Bluefield, 148 W.Va. 369, 135 S.E.2d 262 (1964), overruled on other grounds, Booth v. Sims, 193 W.Va. 323, 456 S.E.2d 167 (1995).
“ ‘When a statute is clear and unambiguous and the legislative intent is plain the statute should not be interpreted by the courts, and in such a case it is the duty of the courts not to construe but to apply the statute.’
“In accord Syl. pt. 2, Keen v. Maxey, 193 W.Va. 423, 456 S.E.2d 550 (1995); Syl. pt. 1, State ex rel. Board of Trustees v. City of Bluefield, 153 W.Va. 210, 168 S.E.2d 525 (1969); Syl. pt. 3, Central West Virginia Refuse, Inc. v. Public Service Com’n of West Virginia, 190 W.Va. 416, 438 S.E.2d 596 (1993).
“Given the clear and unambiguous language defining a contractor for the West Virginia Contractor Licensing Act, we find that an employment agency that refers temporary laborers for employment to licensed contractors, who supervise the laborers on the employment site, but retains all payroll functions, including the wage determinations for the temporary laborers, is a contractor under the West Virginia Contractor Licensing Act, W. Va.Code 21-11-1 to -19 (1991), and subject to the Act’s licensing requirements.
“In this case, we find that PTS, by providing labor to a licensed construction contractor, while retaining all payroll functions for the laborers so provided, is a contractor and therefore, subject to the licensing requirements of the W. Va.Code 21-11-1 to -19 (1991).”
197 W.Va. at 151-52, 475 S.E.2d at 151-52 (footnote omitted).
We agree with the rationale of the Supreme Court of West Virginia. Our licensing statutes are substantially similar to the counterparts in West Virginia and, under the plain language of those statutes, Buena Vista was engaged in general contracting and violated Alabama law by failing to obtain the necessary license. Accordingly, CCC’s agreement with Buena Vista was illegal. As explained supra, “this Court has held that ‘[a] person cannot maintain a cause of action if, in order to establish it, he must rely in whole or in part on an illegal or immoral act or transaction to which he is a party.’ ” Ex parte W.D.J., 785 So.2d at 393, citing Hinkle, 242 Ala. at 378, 6 So.2d at 421. CCC’s claims against White-Spunner and Hartford are dependent upon its contract with Buena Vista because it cannot establish a right to the money it claims without proving that it performed the work required; however, that same evidence establishing that the work was performed — sign-in sheets, invoices, etc. — also establishes that the work was performed by Buena Vista workers pursuant to the illegal contract between CCC and Buena Vista. The courts will not be used to assist “those who transgress the moral or criminal code,” and the summary judgment entered in favor of CCC must accordingly be reversed.[7] Oden, 621 So.2d at 955.
IV.
CCC sued White-Spunner and its surety, Hartford, alleging that White-Spunner failed to pay it for labor and materials it provided as a subcontractor to White-Spunner on the Auburn project in the fall of 2008. After the trial court entered a summary judgment in favor of CCC awarding it over $1.12 million in damages *795 and attorney fees, White-Spunner and Hartford appealed. We now reverse that summary judgment based on the fact that CCC’s claims against White-Spunner and Hartford stem from an illegal contract CCC entered into with Buena Vista, an unlicensed contractor, that provided that Buena Vista employees would complete the work CCC contracted to perform. The cause is therefore remanded for further proceedings consistent with this opinion. Our disposition of White-Spunner and Hartford’s appeal renders CCC’s cross-appeal moot; therefore, that appeal is dismissed.
1101285 — REVERSED AND REMANDED.
MALONE, C.J., and SHAW and WISE, JJ., concur.
PARKER, J., concurs in the result.
1101340 — APPEAL DISMISSED.
MALONE, C.J., and PARKER, SHAW, and WISE, JJ., concur.

. It appears that after White-Spunner failed to make full payment to CCC in October, CCC did not make full payment to Buena Vista. The record is unclear as to whether Buena Vista ultimately refused to work further for CCC without full payment, thus requiring CCC's shutdown, or if CCC independently elected to stop work on the Auburn project.

. Section 39-1-1 (b), Ala.Code 1975, states:
"Any person that has furnished labor, materials, or supplies for or in the prosecution of a public work and payment has not been made may institute a civil action upon the payment bond and have their rights and claims adjudicated in a civil action and judgment entered thereon. Notwithstanding the foregoing, a civil action shall not be instituted on the bond until 45 days after written notice to the surety of the amount claimed to be due and the nature of the claim.... In the event the surety or contractor fails to pay the claim in full within 45 days from the mailing of the notice, then the person or persons may recover from the contractor and surety, in addition to the amount of the claim, a reasonable attorney’s fee based on the result, together with interest on the claim from the date of the notice.”

. As part of their agreement, CCC and Buena Vista executed a "tolling and arbitration agreement,” whereby they agreed to toll their claims against each other for an initial period of 12 months, after which the tolling period could be extended further or any still existing claims pursued in arbitration.

. Like the Motor Transportation Act at issue in Blackwell, the statutes governing the licensing of contractors in Alabama, set forth at § 34-8-1 et seq., Ala.Code 1975, were enacted for the protection of the public; specifically, "to protect the public against incompetent contractors and to assure properly built structures which are free from defects and dangers to the public.” Architectural Graphics & Constr. Servs., Inc. v. Pitman, 417 So.2d 574, 576 (Ala. 1982).

. White-Spunner and Hartford have argued that CCC’s statements indicating that Buena Vista was an unlicensed contractor in CCC's subsequently withdrawn motion seeking a summary judgment against Buena Vista and supporting materials are further evidence indicating that CCC's contract with Buena Vista was illegal. However, although a pleading may be admissible in evidence against a party, a motion for a summary judgment is not a pleading. See Ex parte Flodin, 822 So.2d 372, 378 (Ala.2001) ("The plaintiffs argue that we should consider their motion for a summary judgment as a pleading and look to it for additional support for their contention that the nature of this action is a breach of contract. A motion for a summary judgment is not a 'pleading.' 'Pleadings’ are distinguished from 'motions and other papers’ in Rule 7, Ala. R. Civ. P_”).

. CCC has also argued that White-Spunner has implicitly recognized the existence of a labor-broker exception by the fact that it acknowledges also using temporary workers obtained from employment agencies. However, we note that there is no evidence in the record indicating that those temporary workers used by White-Spunner were engaged in construction or supervisory activities as set forth in § 34-8-1.

. Our resolution of this issue obviates the need to address the other issues raised by White-Spunner and Hartford in their appeal, as well as the issue raised by CCC in its cross-appeal.